STATE *vs.* JAMES E. McELROY *et al.*

MARCH 28, 1946.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J.   This is an indictment in which three defendants, James E. McElroy, Arthur Rushton and Maus Wheelwright, were charged with conspiracy to burn an unoccupied dwelling house.  Upon arraignment in the superior court McElroy pleaded *nolo contendere* and the other two defendants pleaded not guilty.  Thereafter the case proceeded to trial before a jury, which acquitted Wheelwright but returned a verdict of guilty against Rushton, who will hereinafter be referred to as the defendant.  His motion for a new trial was later denied, and the defendant's bill of exceptions to that and other rulings made by the trial justice during the trial and thereafter is now before us for consideration.

In substance the indictment herein charged that the above-named persons, between September 21 and October 17, 1938, at Narragansett in the county of Washington, unlawfully and fraudulently conspired together to wrongfully and maliciously set fire to and burn, and to cause to be burned, a certain unoccupied dwelling house, the property of Lillian Rushton and Emma A. Crees, co-owners, situated at Sand Hill Cove in said town of Narragansett. The evidence in the case disclosed that the building in question, an unoccupied furnished summer cottage, which had been greatly damaged by a hurricane on September 21, 1938, was destroyed by fire between 6 and 7 o'clock on the evening of October 17, 1938. Lillian Rushton is the wife of the defendant and Emma A. Crees is her mother. The building was insured against loss by fire for upwards of $5000 and a claim for the loss was made through the defendant's office to the agent who had written the policies of insurance on the property.

Before any evidence was introduced at the trial, the defendant moved that the indictment be quashed and the denial of such motion is the basis of his second exception. In support of his motion the defendant contended that by reason of the assistant attorney general's opening statement to the jury it appeared that there would be a variance between the allegation of the indictment and the proof to be offered in support thereof. It is clear, however, that this motion was prematurely made by the defendant and its denial by the trial justice was correct. Until the evidence was actually presented it could not be determined whether or not any such variance would appear. The defendant's second exception is therefore overruled.

Thereafter the defendant, at the conclusion of the state's evidence and without resting his own case, moved to dismiss the indictment on two grounds. The denial of that motion is the subject of the defendant's twenty-first exception. We have no statute authorizing the making of a motion to dismiss at that stage of the proceedings, and at common law no

such motion ordinarily could be made unless on some ground alleging lack of jurisdiction. However, if such a motion may be considered, apart from the above ground of alleged lack of jurisdiction, it must be as one for a nonsuit or for a directed verdict. Motions thus made without the defendant resting his case are addressed to the discretion of the court and their denial is not a subject of exception. *Solomon* v. *Shepard Co.*, 61 R. I. 332, 338. If we have considered such an exception in any other criminal case, it is because of exceptional circumstances and is not to be taken as a modification of the above rule.

The defendant, however, strongly urged, in support of his motion to dismiss the indictment, that the superior court was without jurisdiction to dispose of this indictment in view of general laws 1938, chapter 625, §31. In so doing he raised a question which, to the best of our knowledge, has not heretofore been decided in this state. He maintained that this statute provides that trials upon indicements "shall be held before the superior court in the county in which the offense may lawfully be alleged to have been committed or shall have been committed, and not elsewhere", and that such indictment was wrongly brought in Washington county, where the overt act was carried out in pursuance of the alleged conspiracy, whereas the correct venue of the indictment should have been Providence county where the evidence admittedly showed that the alleged conspiracy was entered into and where, he contends, the offense charged was completed and committed.

In support of his position the defendant points out that this court has already adopted a recognized principle of the common law in respect to conspiracy by holding that "the gist of a conspiracy is the unlawful confederacy to do an unlawful act, or a lawful act for an unlawful purpose, though nothing be done in prosecution of it; the offence being complete when the confederacy is made." *State* v. *Bacon,* 27 R. I. 252, 261. See also *State* v. *Bellin,* 55 R. I. 374, 392. In view of such holding and the above statute he argues that it

logically follows that the instant indictment could properly be brought only in the county in which the conspiracy was made, because we have no statute dealing with the necessity or effect of an overt act where such an offense is charged, and are governed, in conspiracy indictments, only by the rules of the common law. Further, the defendant relies on the case of *Regina* v. *Best*, 1 Salk. 174 (1704), as his authority for the holding that such venue was the requirement of the common law. The state, on the other hand, contends that it is settled by the great weight of authority that an indictment for conspiracy may, under the common law, be brought in the place where any overt act was done by any of the conspirators in furtherance of the common design, and that in the instant indictment the venue may therefore properly be laid in Washington county, where the actual burning took place.

We find that the principle underlying the state's contention was enunciated in the case of *Rex* v. *Brisac*, 4 East 164, decided in 1803, the opinion therein citing favorably the case of *King* v. *Bowes* (1787). The same holding has been made by numerous courts in this country in cases wherein apparently no statute was involved or relied upon and where the decisions were under the common law. Among such cases are the following: *People* v. *Mather*, 4 Wend. 229 (N. Y.); *People* v. *Arnold*, 46 Mich. 268; *Commonwealth* v. *Gillespie*, 7 Serg. & Rawle 469 (Pa.); *Commonwealth* v. *Bartilson*, 85 Pa. 482; *Commonwealth* v. *Saul*, 260 Mass. 97; *Fire Insurance Companies* v. *State*, 75 Miss. 24; *Noyes* v. *State*, 41 N. J. L. 418. See also *Hyde* v. *United States*, 225 U. S. 347; *Regina* v. *Connolly*, 25 Ont. Rep. 151; 31 Ann. Cas. 1914 A. 632 n.; 2 Whar. Cr. Law 1936, §1666.

In *People* v. *Arnold, supra,* at page 275, the court stated: "It is also objected that the defendant was informed against and tried in the county of St. Joseph while the conspiracy is alleged to have been formed in Calhoun; so that the defendant has been deprived of his right to a trial by a jury of the vicinage. But the overt act was committed in St. Joseph; and according to the common-law precedents the misde-

meanor may be tried wherever an overt act in pursuance of the conspiracy takes place."

In *People* v. *Mather, supra,* the court used the following language at page 259, in explanation of the principle upon which conspirators are punishable at the place where an overt act done pursuant to the conspiracy takes place: "In indictments for conspiracy, the venue may be laid in any county in which it can be proved that an *overt act* was done by any one of the conspirators in furtherance of their common design. . . . If conspirators enter into the illegal agreement in one county, the crime is perpetrated there, and they may be immediately prosecuted; but the proceedings against them must be in that county. If they go into another county to execute their plans of mischief, and there commit an overt act, they may be punished in the latter county without any evidence of an express renewal of their agreement. The law considers that wherever they act, there they renew, or, perhaps, to speak more properly, they continue their agreement, and this agreement is renewed or continued as to all whenever any one of them does an act in furtherance of their common design."

See also Holmes-Pollock Letters, where Sir Frederick Pollock in a letter to Judge Holmes discussed the nature of conspiracy, apart from statute and as it was at common law, and at page 196 stated: "On principle it seems to me that conspiracy must be a continuing offence, like trespass, and continues as long as the common unlawful design is in being and capable of execution. . . . If it is a continuing offence then every act done in pursuance of the unlawful common purpose is the act of all the conspirators, and (as proof of a continuing agreement then & there) makes a good venue at the place where it is done."

The defendant relies entirely on a single sentence near the end of the opinion in *Regina* v. *Best, supra,* which reads: "The venue must be where the conspiracy was, not where the result of the conspiracy is put in execution." This case is very briefly reported in 1 Salk. It appears clearly that the

case was before the court on a demurrer to an indictment charging conspiracy. The indictment, however, set out merely the formation of the alleged conspiracy, but not the performance of an overt act by any of the alleged conspirators in furtherance of their design. The question of proper venue was not in any manner raised by the demurrer and plainly, under the facts alleged, the indictment could be laid only in the county in which the conspiracy was entered into. The quoted statement from that case was, therefore, not necessary to the decision of the questions then before the court.

Furthermore, *Regina* v. *Best, supra,* was reported several times by different contemporaneous reporters, one apparently prior to 1 Salk., and in no one of these other reports does the quoted language appear anywhere in the case. See 2 Raym. 1167; Holt (folio) 151; 6 Mod. Cas. 186. This point is fully discussed by *Boyd, C.,* in *Regina* v. *Connolly, supra,* beginning at page 189. He describes the ruling in question as "doubtful". In addition neither the court nor counsel in *Rex.* v. *Brisac, supra,* cited or made any reference whatever to *Regina* v. *Best, supra,* although the court in *Rex.* v. *Brisac* discussed the proper venue for a conspiracy indictment, where an overt act had been committed by a conspirator in a county other than the one in which the conspiracy was entered into, and held that such an indictment could be laid where the overt act had taken place.

After consideration we are of the opinion that for the reasons indicated above, we cannot accept *Regina* v. *Best* as authority on the point which we are discussing. Apparently, as reported in 1 Salk., it is the only case taking the view now advanced by the defendant, namely, that an indictment for conspiracy must be brought in the county in which the conspiracy is made, and nowhere else. On the other hand, for well over one hundred years it has been held by ample and practically uniform authority that at common law a conspiracy indictment, being for a misdemeanor, could properly be brought in any county where an overt act was committed

in furtherance of the conspiracy. This holding in our judgment appears to be well settled common-law practice in England and generally established practice in this country, regardless of the causes and reasoning which brought it about; and we would be acting contrary to such practice without sufficient justification if we were to follow the doubtful language quoted by us from *Regina* v. *Best, supra,* as reported in 1 Salk., and as urged by the defendant.

In view of the recognized nature of conspiracy as a continuing offense and as a misdemeanor at common law,' which governs our action herein, we find that the state, in accordance with §31, *supra,* could lawfully allege that the offense was committed in Washington county, and properly bring the defendant to trial on the present indictment in that county, where it was alleged that an overt act was committed in pursuance of the conspiracy charged; and that the state was not required to lay the indictment and try the defendant solely in Providence county, where admittedly the evidence showed that the conspiracy was originally entered into. The defendant's twenty-first exception, which is to the action of the trial justice in refusing to dismiss the indictment because of alleged lack of jurisdiction, is therefore overruled.

Our holding in respect to the exception just considered applies, for the same reasons, to the defendant's twenty-third exception, which is to a portion of the charge of the trial justice relating in substance to the correct venue of the indictment, and to the fact that an act of one conspirator in furtherance of the alleged conspiracy is considered in law to be the act of all the conspirators. The twenty-third exception is therefore also overruled.

At the conclusion of all the evidence the defendant moved that a verdict be directed in his favor, and he is now pressing his twenty-second exception to the denial of this motion. In our opinion he takes nothing by this exception. A consideration of the evidence satisfies us that the trial justice acted correctly in submitting the case to the jury, since there was clearly sufficient evidence introduced on behalf of the

state in support of the allegations of the indictment to require such a ruling, in accordance with established practice on a motion to direct. The above exception is overruled.

The defendant's first exception is to the refusal of the trial justice to grant his motion for a new trial following his conviction by the jury. The following facts appeared from evidence submitted on behalf of the state, chiefly through the witness McElroy. A week or ten days after the hurricane of September 21, 1938, that witness, who worked for the defendant on commission in connection with the latter's real estate and insurance business, had occasion to be at the defendant's home in Cranston during the evening. At that time the defendant referred to the summer cottage which belonged to his wife and her mother at Sand Hill Cove, and stated in substance, among other things, that he would never live in it again, as it had been wrecked by the hurricane, and that he would like to have it burned down. He then asked McElroy if he could do it and the latter said that he did not believe that he could; but after some further talk he stated that he would think it over and let the defendant, who had offered to pay money to have it done, know later. The defendant's wife was present during this conversation. Thereafter there were several talks between McElroy and the defendant in the latter's office about the same matter, and McElroy finally told him that he would do the burning when he could.

In the meantime McElroy had talked in a taproom in Providence with Wheelwright, whom he knew well, about the proposed burning, and the latter had said in substance that they had better do it, as they both needed money. Other conferences on the same subject between McElroy and the defendant and between McElroy and Wheelwright followed. Apparently on Saturday, October 15, McElroy and Wheelwright visited the property and discussed how to burn it. Prior to this visit the defendant, who had knowledge that McElroy had discussed the matter with Wheelwright, had given the former $30.

About 10 or 10:30 o'clock on the morning of October 17 McElroy and Wheelwright met in the taproom and agreed to attempt the burning that day. The former then went to the defendant's office and told him that he, McElroy, and Wheelwright were going to do the act that day and asked for money and received $10 from the defendant. On that afternoon, after having had a few drinks, McElroy and Wheelwright drove in the former's automobile to Washington county. On the way they stopped at a country store near Wickford Junction and Wheelwright bought some kerosene, McElroy remaining in the car. Then they stopped at Narragansett Pier and again had a few drinks. From there they drove past the cottage in question to the fishing village at Sand Hill Cove. When they arrived there it was dark. Wheelwright got out and spoke to some man near the breachway and then reentered the automobile which McElroy drove back, stopping a short distance from the cottage. Wheelwright then entered the building, taking with him the kerosene which he had purchased, and set the place afire. McElroy remained in the car with the motor running.

After the fire was started Wheelwright got into the automobile and McElroy drove it toward Providence, leaving Wheelwright at a cafe in Pawtuxet and driving alone to the defendant's home, but the latter was not there. McElroy then went to his own home. Later in the evening he went back to the defendant's home, waited for him to come in, and then told him that the house was burned. The defendant decided to drive to Sand Hill Cove and he and McElroy went there in the former's automobile, arriving about 11 or 11:30 p. m. The house had then completely burned down, as had two adjoining cottages, and after remaining at the place a short time the two men drove back towards Providence, stopping at a place called Ezra's Diner for something to eat, both talking at that time with the proprietor thereof. They then returned to the defendant's home. Thereafter McElroy asked the defendant for money and the latter suggested waiting until he had received the proceeds of the insurance.

Later McElroy sent Wheelwright, with a note, to the defendant, who gave Wheelwright $100, which he divided with McElroy. Still later the defendant sent McElroy $35. At the trial certain of the state's witnesses were unable to positively identify Wheelwright as the man who had purchased kerosene at the store near Wickford Junction, or as the man who had gotten out of the car at the breachway at Sand Hill Cove on the evening of October 17.

Neither the defendant nor Wheelwright testified. The defendant, however, presented witnesses some of whom attested to his good character while others attacked McElroy's reputation for veracity. Other witnesses gave evidence which tended to show that at one time McElroy had made statements indicating that he was angry with the defendant concerning a real estate transaction and would get even with him. Still other witnesses testified that the defendant generally went cruising on his yacht with guests on week ends, even through the month of October. Certain witnesses also testified that they were with him in relation to a real estate matter from a certain hour in the morning of October 17 through the evening of that day.

The defendant contends that the trial justice was clearly wrong in not granting him a new trial. His contention is based not only on his own estimate of the evidence and its alleged insufficiency to meet the degree of proof required for conviction in a criminal case, but also on certain statements contained in the rescript of the trial justice when he denied the said motion. The defendant claims that such decision is, in effect, inconsistent with certain reasoning and findings set out in the rescript, particularly in connection with the trial justice's opinion of the weight to be accorded McElroy's testimony.

The latter was the principal witness for the state. The evidence shows that when first interrogated by the state police he denied having any knowledge of the burning. Later he gave a statement to them implicating the defendant but not Wheelwright. He then sent the latter a message telling

him in substance to get away. Finally, McElroy's testimony given at the trial is said to vary materially in several particulars from that given by him at the preliminary hearing in the district court, as well as from certain facts set out in the beforementioned statement. The defendant therefore argues strongly that McElroy is not worthy of belief in any particular.

The trial justice, in view of all the facts and circumstances, recognized the weakness of McElroy's testimony. In his rescript he stated that he would not let the verdict stand if it depended on McElroy's testimony alone, and that the latter appeared to be true to no one. However, he took the position that the real question was whether or not the story of the events involving the defendant as told by McElroy at the trial under oath was sufficiently corroborated. He then came to the conclusion that the testimony of McElroy was corroborated by reason of the testimony of other witnesses concerning the fact and details of the visit of McElroy and some other person to Sand Hill Cove on October 17, which visit was followed by the immediate burning of the house in question, the quick flight, the report to the defendant and the later message to Wheelwright.

The trial justice also pointed out that at the time of the fire the relations between McElroy and the defendant were pleasant, and that no sound reason then appeared why McElroy should have set fire to the building merely to injure the defendant or involve the latter without foundation. In conclusion he stated that he believed that no reasonable doubt existed that a conspiracy took place in Providence county and that it was executed in Washington county, and "that notwithstanding the extremely low credit in which McElroy stands, the corroboration is sufficient to brace his story so that it will support the verdict."

Upon consideration we find no inherent inconsistency in the conclusion reached by the trial justice when he decided that the verdict of the jury was supported by the evidence beyond a reasonable doubt. His rescript must be read as a

whole. His decision, since he saw and heard the witnesses testify, is, under our practice, entitled to persuasive force. In our opinion he has not misconceived the evidence; neither can we say, in view of all the facts and circumstances appearing in evidence, that his decision denying the defendant's motion for a new trial is clearly wrong. It should be noted, in considering the decision of the trial justice, that many material facts testified to by McElroy and found to have been corroborated by other evidence and witnesses, were not contradicted. The defendant's first exception is therefore overruled.

There are in the case a group of exceptions numbered from 3 to 20, inclusive, which are to rulings of the trial justice admitting and rejecting evidence during the trial, and to rulings on motions to strike out testimony. Of these exceptions apparently the one numbered 10 is not pressed and is deemed by us to be waived. Of the others only two, the eleventh and seventeenth, are specifically argued. The remainder are presented without further comment. We have examined all these exceptions, except the tenth. Upon consideration we find that none of the rulings of the trial justice covered by any of them constitutes prejudicial error. In our judgment, therefore, these exceptions are without merit, and they are all overruled.

The defendant's remaining exception is to the refusal of the trial justice to grant his motion in arrest of judgment. This was made after his motion for a new trial had been denied, but before the case was certified to this court on his bill of exceptions. The motion was based on his claim that the superior court had no jurisdiction to enter judgment or to impose sentence against him because his conviction was void, since the indictment did not contain the phrase "by others to the Grand Jury unknown" and that the verdict was void because only one of the so-called conspirators was found guilty.

We find no merit in the first of these claims because the indictment here specifically named three conspirators including

the defendant. The other contention of the defendant is based on the fact that Wheelwright was acquitted; that McElroy pleaded *nolo contendere,* but has not yet been sentenced; and that the defendant Rushton was the only conspirator actually convicted by the jury. It is argued that under an indictment such as the instant one there must be a conviction of at least two persons in order to hold the defendant, and that such was not the case here, because McElroy's plea of *nolo contendere,* in the absence of the imposition of a sentence thereon, cannot be considered as a conviction.

The chief question thus raised relates to the effect to be given to a plea of *nolo contendere* under the circumstances appearing herein. This court has had occasion to consider in several cases the meaning and effect of such a plea both generally and in relation to certain narrow issues not material here. While a plea of *nolo contendere* may not establish defendant's guilt for all purposes and in other proceedings, it is clear that such a plea has the effect of a plea of guilty for the purposes of the particular proceedings on an indictment in which it is entered. *State* v. *Conway,* 20 R. I. 270. To the same effect, see *Barker* v. *Almy,* 20 R. I. 367, 369, where this court stated: "A plea of *nolo contendere* is an implied confession of guilt, and has the same effect as a plea of guilty so far as the proceedings on an indictment are concerned." See also *Doughty* v. *DeAmoreel,* 22 R. I. 158.

Applying the above principle to the issues before us, it is clear that, so far as the instant indictment is concerned, McElroy's plea of *nolo contendere,* having been accepted by the court, amounted to an implied confession of his guilt and had the same effect as a plea of guilty. It was not necessary, as the defendant argues, that McElroy be formally convicted by the jury and sentenced within the technical meaning of those terms. His plea of *nolo contendere* implying his guilt was sufficient. The well-settled rule apparently is that one defendant in a prosecution for conspiracy cannot be convicted when *all* of his alleged coconspirators, be they

one or more, have been acquitted, or have been discharged under circumstances which amount to an acquittal. See *Berry* v. *State,* 202 Ind. 294, and 72 A.L.R. 1180 n. That certainly is not the case here. McElroy not only was not so acquitted or discharged, but his plea to the indictment, accepted by the court, amounted in law to a plea of guilty and subjected him to sentence thereon by the court as if he were found guilty. The case of *Commonwealth* v. *Smith,* 151 Pa. Super. 113, in which two defendants were named in the same indictment for conspiracy, one pleading *nolo contendere* and the other being convicted after a plea of not guilty, presents a state of facts in many respects not unlike those in the present case. The opinion contains a discussion of the effect and nature of a plea of *nolo contendere* by one alleged conspirator, and the conviction of the other defendant who pleaded not guilty was upheld. We think that case properly stated the law in this regard.

In view of the facts and circumstances appearing in the instant case we are of the opinion that the decision of the trial justice denying the defendant's motion in arrest of judgment was correct. The exception to such decision is therefore overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*John H. Nolan,* Attorney General, *James O. Watts,* Special Assistant to the Attorney General, for State.

*Michael DeCiantis,* for defendant Arthur Rushton.