### STATE *vs.* PETER LORENZO.

JULY 26, 1946.

PRESENT: Flynn, C. J., Moss, Capotosto and Baker, JJ.

FLYNN, C. J.   The defendant Peter Lorenzo was tried and found guilty by a jury in the superior court upon an indictment charging him with having committed an abortion upon

the body of Blanche I. Gilman. Thereafter the trial justice denied the defendant's motion for a new trial and the case is before us upon his exceptions to that ruling, to the denial of his motion for a directed verdict, and to other rulings made during the course of the trial.

The following is a brief summary of certain facts appearing in the evidence: Defendant lived in the town of Johnston and maintained an office in the city of Providence. There he kept appointments and practiced as a physiotherapist and chiropractor. Blanche I. Gilman, upon whose body the defendant was alleged to have committed an abortion, lived with her husband Ralph S. Gilman and their two small children in Brockton, Massachusetts.

In late October, 1943 she became pregnant, which condition was verified by medical examination at the Goddard Hospital in Brockton and later, on January 17, 1944, by Dr. Jonah Fieldman, of Abington, Massachusetts. Shortly thereafter, on Sunday, January 23, 1944, Mr. and Mrs. Gilman drove to Providence to locate the defendant, whose name had been suggested to them, with the object of having him perform an abortion. They met and talked with him outside his home at 98 Spring street in Johnston where he was told of Mrs. Gilman's desire to have an abortion performed. After satisfying himself that the Gilmans had learned of him from a reliable source, he made an appointment for them to come to his office on the following Friday, January 28, 1944, at 2:30 p. m. and fixed the fee that he would charge as "at least $100.00".

The Gilmans drove to Providence in their automobile on January 28. They arrived in the afternoon around two o'clock, parked their automobile at Market Square and walked to defendant's office. This office was located on the second floor of a building at 350 Westminster street and comprised three small, connecting rooms, that is, a waiting room, a middle room, and a room for treatments wherein was located a wooden bed. From this last room, hereinafter called the bedroom, a door led directly to the corridor out-

side, so that exit was possible without passing through the other two rooms. A bolt was on the inside of that door, and the door connecting the waiting room with the middle room could be latched or locked.

The Gilmans were met by the defendant in the waiting room and were brought to the middle room. Mrs. Gilman was directed by him to go into the bedroom. The defendant then latched or locked the door between the middle room and waiting room and went into the bedroom. After telling Mrs. Gilman to remove certain of her clothing, he returned to the middle room and told her husband that the fee usually was paid in advance. Thereupon Gilman paid him $100 in $10 bills. No receipt was given. Defendant then went into the bedroom and closed the door. After five or six minutes he returned, having a doctor's mirror on his head, and reported to Gilman, who had remained in the middle room, that his wife was responding readily to treatment and that, if they could wait about three-quarters of an hour, it would probably not be necessary for her to return the next day. The defendant then returned to the bedroom and Gilman heard his wife moaning and heard her cry out, "Oh, Doctor, oh Doctor" several times.

In a half or three-quarters of an hour the defendant came out of the bedroom and left the door open. Gilman saw his wife on the bed and she appeared to be in bad condition. She had been in good health before she submitted to the defendant's treatment. He then gave Gilman a box of white tablets and told him to give them according to the instructions, written by the defendant on the box, if Mrs. Gilman developed a temperature. Gilman was also instructed to telephone to him the next day as to Mrs. Gilman's condition and at that time was given defendant's business card on which was printed: "Office: Gaspee 9737 Res. Centredale 0412-W Dr. P. A. Lorenzo Electric Treatments Office Hours 10 to 4 P. M. or by Appointment 350 Westminster St. Providence, R. I."

When defendant learned that the Gilman automobile was

parked at least fifteen minutes' walking distance from the office, he telephoned several times for a cab and finally obtained one for the Gilmans. Meanwhile another person or persons had come to the waiting room and spoke with the defendant, who then returned to the bedroom and let the Gilmans out through the door leading directly into the corridor without their going through the waiting room. The Gilmans, at about four o'clock, took the cab to their automobile and drove back to Brockton. On the way home Mrs. Gilman showed evidence of her illness. That evening Gilman gave her the tablets as instructed by the defendant and otherwise assisted her personally during the night.

On the following day he telephoned to the defendant as instructed, calling the number that was on the card which the defendant had given to him. The telephone company's records showed that such a call had been completed. In that telephone conversation the defendant, after verifying Gilman's identity and hearing the report of Mrs. Gilman's condition, advised him to call a town doctor and "Just tell him that she had a miscarriage". That evening, Saturday, January 29, Gilman called Dr. Fieldman at Abington, who came and examined Mrs. Gilman and left a prescription for her. When she showed no progress the next day, Dr. Fieldman called an ambulance and had her taken to the Brockton City Hospital, where she was given a blood transfusion and other treatments. She died at eleven o'clock on Monday night in the hospital. An autopsy was performed by Dr. Pierce H. Levitt, medical examiner for Plymouth county, Massachusetts. He testified as to the results of the autopsy and gave his opinion that Blanche I. Gilman "came to her death as a result of an infection of the abdominal cavity caused by damage done to the intestine by an instrument that had been passed through the wall of the uterus incident to the procurement of an abortion."

An investigation by Massachusetts authorities followed Mrs. Gilman's death. In June, 1944 Gilman and investigators from the Brockton police department came to police

headquarters in Providence to discuss the case. The Providence police inspectors, who accompanied them to the defendant's office, then and there disclosed their identity fully to the defendant and asked him certain questions concerning his alleged meetings with the Gilmans. His answers to all these questions were general denials. At this time, in defendant's presence and without objection by him, the local police inspectors searched his office and showed him all articles which they found, and questioned him concerning them. These included tablets and cardboard boxes for tablets that were the same as those which Gilman testified he had received from the defendant, and also certain instruments, especially state's exhibit 4. This was a metal instrument, resembling a buttonhook at one end and having U-shaped prongs or teeth at the other end.

The defendant discussed these articles freely with the officers and explained where they had been obtained by him and what they were used for, as far as he knew. None of the actions by the police and none of defendant's conversations in the office resulted in any way from threats, or promises of reward, or any coercion by the officers. Following the search and seizure he went voluntarily with the officers to police headquarters where further questioning took place. A warrant for his arrest was later issued and he was subsequently indicted, tried, and found guilty.

The defendant has expressly failed to brief or argue forty-eight of the exceptions appearing in his bill of exceptions. These are deemed to be waived and are overruled. The remaining twenty-eight exceptions are argued under four categories which relate to: (1) rulings admitting certain evidence that was taken by the police when they searched defendant's office, and certain conversations with defendant that took place during that search; (2) rulings excluding certain questions asked by the defendant of the witnesses Gilman and Dr. Fieldman; (3) rulings denying defendant's motions for a directed verdict; and (4) the decision denying the defendant's motion for a new trial.

The first category of seventeen exceptions relates to the introduction in evidence of certain articles which the defendant alleges were taken by the police during a search of his office without a warrant in violation of article I, sections 6 and 13, of the Rhode Island constitution. These articles read: "Sec. 6. The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched, and the persons or things to be seized. Sec. 13. No man in a court of common law shall be compelled to give evidence criminating himself." Like provisions are found in the fourth and fifth articles of amendment to the constitution of the United States.

The defendant contends that this property was taken during an *illegal* search of his office and that such property and the conversations of police officers with him in his office during that alleged illegal search were in violation of his constitutional rights, which prohibit such an illegal search and prohibit a defendant's being compelled to give evidence incriminating himself. In support of this contention, which is the defendant's principal ground of complaint, many Federal cases and others are cited to support the proposition that generally evidence obtained by government officers through illegal search and seizure is not admissible from them in a criminal trial against the defendant. These cases follow the principles set forth in *Boyd* v. *United States,* 116 U. S. 616, and are collected in annotations in 134 A. L. R. 819, and 150 A. L. R. 566.

On the other hand, the state contends, first, that the search was not illegal, even though there was no search warrant, because it was made in the presence of the defendant and with his full acquiescence and consent; secondly, that if the search is held to be unlawful, the evidence obtained thereby is nevertheless admissible against a defendant charged with a felony, according to the rule followed by

most of the states; and, third, that even if the rule prevailing in the Federal courts is applied, the evidence is nevertheless admissible because the defendant failed to make a motion before trial to suppress it. The cases supporting these contentions in general follow the principles discussed in *People* v. *Adams,* 176 N. Y. 351, and they also are collected in the annotations in A. L. R. *supra.*

If the facts in evidence justified the defendant's assumption that the search here must be considered as unreasonable and illegal, it would be necessary to determine whether we should adopt the rule that prevails in most of the states and that follows *People* v. *Adams, supra,* whereby such evidence, if otherwise competent, is nevertheless held to be admissible, regardless of how it came into the officer's possession; or whether we should apply the rule that presently prevails in the Federal courts and in the states following that rule, namely, that evidence obtained by government officials through an illegal search generally is not admissible against a defendant in a criminal trial providing the defendant has made a timely motion to suppress such evidence. In the instant case, however, we do not reach and we do not decide that question because of the record before us.

In our opinion the defendant's position is based entirely upon the assumed premise that the property in question and the defendant's admissions were obtained by and during an *illegal* search in violation of defendant's constitutional rights. But the evidence here shows that, although the police had no search warrant, the search and seizure were nevertheless made entirely in the presence of the defendant and with his full knowledge and consent. No force, mental or physical, was used directly or indirectly. No misrepresentation was made by the police of their identity or purpose and no trickery was resorted to or employed. The defendant was present at the beginning of and at all times during the search and seizure. He was aware of what was being done and yet he made no objection whatever.

Moreover there is no suggestion in the evidence that he

was unwilling or even hesitant about allowing the search of his office, or in discussing freely with the police any of the articles found there and taken at that time, or in answering any of the questions then asked of him about such articles or about Gilman or about the alleged incidents, meetings and conversations between him and the Gilmans. He did not deny that the police had done everything in the manner as they testified or that he had cooperated with them in all respects. In our opinion he did not deny that the police had shown and talked to him about all the state's exhibits, including exhibit 4, then being taken by them from his office.

He first told the police in his office at the time of the search, when the metal instrument, exhibit 4, was found in his desk and shown to him, that he had never seen that instrument before and that he did not know for what it was used. At the trial, however, he first testified that he had bought the desk and contents in Central Falls in 1933 or 1934; that this instrument was in his desk at the time of the search; that he knew it was there; that it belonged to him; and that he did not miss it until it was produced at trial. However, he admitted that all other articles and exhibits had been shown to him; and when asked specifically in cross-examination if the officers had not also shown him exhibit 4 and asked him what it was, he merely stated: "I don't recall" and again "I don't believe they did".

In our opinion there is nothing in the evidence to show that either the search or seizure was made otherwise than with the voluntary consent of the defendant. When the evidence is fairly read, it irresistibly leads to the conclusion that the defendant was present at all times during the search and seizure and was entirely willing and cooperative in this regard, although he did not admit the truth of any of the material accusations concerning the Gilmans; and that his objections came at trial for the first time. Under all these circumstances we cannot say that the trial court erred in admitting evidence obtained at the time of such search.

Even if we were to assume that the search and seizure

were illegal and if we were to apply the Federal rule, which is most favorable to the defendant, the evidence which he knew the police had taken during that search of his office would have been admissible. The rule in the Federal courts seems to be well established that even if the search is made without a lawful warrant or is otherwise unreasonable and illegal, nevertheless the evidence obtained thereby is admissible if a defendant, despite adequate knowledge of the search and seizure, fails to make a timely motion to suppress it. See cases in annotations, 134 A. L. R. 826, and 150 A. L. R. 573. The reason is that ordinarily a court will not stop in the course of a criminal trial to determine a collateral issue of how the evidence came into the government's possession. In the instant case the evidence justifies the conclusion that the defendant had knowledge that the police had searched and taken from his office the metal instrument, exhibit 4, so as to require before trial his motion to suppress it, if his objection to its admissibility at trial was to be upheld under the Federal rule. No such motion was made by the defendant before or during the trial.

Apparently in order to explain his failure to make such a motion before trial, the defendant's counsel argued before us that he "did not know that this particular property would be used until it was introduced in evidence", and that his objection at the trial therefore is timely, because the other pertinent facts show unquestionably that the search and seizure *must* have been illegal. In our opinion the evidence here does not support this conclusion. Even if we assume that the defendant had made timely motion or objection, nevertheless the undisputed evidence in this record certainly does not require a conclusion that the search was clearly made without his voluntary consent or that he did not have adequate knowledge thereof to require him to move before trial to suppress it. No case from any jurisdiction is cited which holds that a defendant may not voluntarily waive his constitutional rights and consent to a search that is made without a warrant and to a seizure of his property thereunder.

In our opinion, if voluntary consent thereto is given, as here, the evidence obtained by such search is admissible.

Therefore, without deciding which of the above-mentioned rules is the more salutary, and after giving the defendant the benefit of the application of the rule most favorable to him, we conclude that the record here shows a search of defendant's office without a warrant but clearly shows that it was made entirely in the presence of the defendant and with his full knowledge and voluntary consent. In other words the defendant voluntarily waived his constitutional rights. In that respect the evidence does not show coercion or any of the elements which clearly distinguish the numerous cases cited by the defendant from the facts in the instant case. Those cases generally show special facts, as, for example, that the defendant was not present at all times; or did not and could not reasonably know of the search and seizure; or that the search and seizure were made under circumstances that clearly negatived any reasonable conclusion that he had given his voluntary consent thereto. Moreover, in all of those cases, where the defendant had adequate knowledge, a motion to suppress was made before trial. Therefore the exceptions in the first category numbered 24, 25, 27 to 37 inclusive, and 70 to 73, inclusive, are overruled.

The second category of eight exceptions relates to rulings sustaining the state's objection to certain questions asked of the witnesses Gilman and Dr. Fieldman. The questions to Gilman were as follows: "Were you arrested?" and "At that time, Mr. Gilman, was there any offer or promise that you would not be prosecuted?" Whatever might have been the materiality of these questions if they had been directed to an arrest or promise by Rhode Island or Providence officials, they clearly related here to what the authorities in Massachusetts may or may not have done. The questions immediately preceding them and the admissions of defendant's counsel in the transcript disclose this to have been the case. They were not probative of any issue at this trial; and if they were designed as a foundation on which to later im-

peach the witness, nothing was asked, shown or offered that would have made the exclusion of these questions prejudicial error.

The questions to Dr. Fieldman under consideration were: "Did you appear before the Grand Jury?" and "Was a summons served on you to appear before the Grand Jury?" Here again the defendant's counsel was inquiring about the grand jury of Plymouth county in Massachusetts. Defendant contends for the right to bring out proper facts to weaken the credibility of the witnesses Gilman and Dr. Fieldman, on the alleged ground that they might have been accomplices. But on this record these particular questions are irrelevant, since they relate solely to matters concerning the Massachusetts authorities which, in the absence of evidence to connect the Rhode Island officials as participants, could not bind the authorities here. Therefore the exceptions in the second category numbered 15 to 20, inclusive, and 50 and 51 are overruled.

The third category contains two exceptions to rulings by the court denying defendant's motions for a directed verdict. The first motion was made at the conclusion of the state's evidence without the defendant resting his case. We have held that the defendant takes nothing by such an exception unless he closes his case at that time. *State* v. *McElroy,* 71 R. I. 379; *State* v. *Kozukonis,* 71 R. I. 456. At the conclusion of all the evidence, however, the defendant rested his case and moved again for a directed verdict on the same grounds that he had urged upon the court previously. This motion was also denied. We have examined the evidence and from the defendant's argument it is apparent to us that he overlooks or ignores the well-established rule that upon such a motion the evidence must be considered most favorably to the state. *State* v. *Wright,* 70 R. I. 39. If the evidence is examined in accordance with this rule, it is clear that there were material issues of fact, based upon conflicting evidence, which the jury were entitled to determine in the first in-

stance. Therefore the exceptions in the third category numbered 67 and 74 are overruled.

The fourth category is confined to the single exception of the defendant to the denial of his motion for a new trial. The trial justice in a decision from the bench considered the evidence and the weight thereof; and, as shown by his decision when he was denying defendant's motion for a directed verdict and also by his charge to the jury, he evidently recognized that the state, because of the particular form of the indictment, was bound to establish beyond a reasonable doubt, (1) that Blanche I. Gilman was pregnant; (2) that the defendant did force and thrust into her body and womb an instrument; (3) that this was done with an intention to cause or procure a miscarriage; (4) that such miscarriage was not necessary in order to save the life of Blanche I. Gilman; and (5) that she died as a result of that forcible intrusion of an instrument being thrust into her body and womb by the defendant. In making his decision he passed favorably upon the appearance of Gilman and the credibility of his evidence and passed unfavorably upon the evidence of the defendant. We do not find that the trial justice misconceived the law or overlooked any material evidence or that he failed to comprehend and fulfill his duty under the law to pass his independent judgment on the weight of the evidence and credibility of the witnesses.

The defendant denied that he knew or met or talked with the Gilmans at any time; or that they were ever in his office; or that he ever performed an abortion upon the body of Mrs. Gilman. Much of the evidence and argument for him was devoted to an attempt to weaken the testimony of Gilman and Dr. Fieldman as possible accomplices. But the jury was expressly instructed as to the law in this respect and the defendant has pressed no exception to the charge. In our opinion, if the evidence of Gilman on vital issues in the case is believed and that of the defendant is disbelieved, which was the view of both the jury and the trial justice, the state has unquestionably proved the necessary facts

from which the jury were justified in finding beyond a reasonable doubt that the defendant was guilty as charged in the indictment. Therefore the exception in the fourth category numbered 76 is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

MOTION FOR REARGUMENT.

OCTOBER 30, 1946.

PER CURIAM. After our decision in the above case the defendant asked and received permission to file a motion for reargument. Pursuant to this permission he has filed such a motion, setting out therein two grounds on which he bases his contention that justice requires a reargument of the case. We have carefully considered such grounds and we are of the opinion that they do not warrant a reargument of the case.

Motion denied.