401 A.2d 41.

STATE *vs.* ROBERT D. SMITH.

MAY 1, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

JOSLIN, J. The defendant, Robert D. Smith, was tried before a jury in the Superior Court, convicted of first degree murder, and sentenced to life imprisonment. The case is here on his appeal.

Our decision in *State* v. *McGehearty*, ____ R.I. ____, 394 A.2d 1348 (1978) was announced subsequent to the trial of this case. The state concedes, however, that under *Hankerson* v. *North Carolina*, 432 U.S. 233, 97 S. Ct. 2339, 53 L. Ed. 2d 396 (1977), it was reversible error for the trial justice not to have instructed the jury, according to the rule later enunciated in *McGehearty*, that, once defendant had satisfied his burden of going forward with some evidence on the issue, it became the state's burden to prove, beyond a reasonable doubt, that defendant was not so intoxicated as to be unable to harbor a specific intention to kill. Consequently, the state agrees that defendant is entitled to a new trial.

The defendant, however, is not satisfied with a new trial on an indictment that will permit him to be found guilty of first degree murder. Instead, he insists that the evidence at his trial will not support a finding that the premeditation required for a conviction of first degree murder "existed for more than a barely appreciable length of time before the killing" as mandated by *State* v. *Fenik*, 45 R.I. 309, 315, 212 A. 218, 221 (1923). Therefore, he argues that the trial justice erred in denying his motion for a judgment of acquittal of first degree murder, and that accordingly, at his new trial the jury should be precluded from returning a verdict of guilty of murder in the first degree.

We test that contention by viewing the evidence in the case and the inferences reasonably deducible therefrom in the same manner as was required of the trial justice when, at the close of all the evidence, he decided defendant's motion for a direction of a judgment of acquittal. Thus, we examine the record in the light most favorable to the state in order to ascertain whether it is lacking in evidence of the requisite premeditation. *E.g.*, *State* v. *Distante*, 118 R.I. 532, 536, 375 A.2d 212, 215 (1977); *State* v. *Rose*, 112 R.I. 402, 406, 311 A.2d 281, 283 (1973).

An extensive discussion of the evidence is unnecessary here. During the afternoon and early evening of November 3, 1974, defendant and victim were both at a barroom in Pawtucket. A verbal altercation took place between them, and it escalated to a pushing and shoving match. Sometime between 7 and 7:30 p.m., defendant said, "Let's go outside and finish this matter." The two of them left the barroom. Soon thereafter, Joseph DiPaolo, another patron of the bar, followed them. When he reached the street, where his automobile was parked, he found the pair still skirmishing.

A short time later, defendant and the victim, but not DiPaolo, adjourned to an unlighted parking lot across the street from the barroom. There was no testimony about what then took place, but after the two had been there for about 10 minutes, defendant signaled DiPaolo to drive his automobile to the parking lot. DiPaolo complied and defendant placed the victim in the vehicle. The victim was bleeding from his face and not moving, but DiPaolo was unsure whether he was dead or alive.

The defendant then told DiPaolo to drive the "f'n car" and they set out for Haines Park in Barrington, reaching that destination in about 20 minutes. The defendant carried the victim from the car and was gone for 5 or 6 minutes. DiPaolo could not see what was happening, but he heard defendant yelling. The defendant finally returned alone to the automobile, and he and DiPaolo drove away. The victim's body was found in the park at about 11:15 that night.

The medical testimony at the trial attributed death to extensive injuries inflicted by blunt force[1] and approximated

---

[1]The medical examiner testified and described her external examination of the victim's body as follows:

"There were contusions of the face; that is, bruises of the face, predominantly along the right aspect, involving the right eye, sometimes called black and blue eye. Bruising of the eye, and adjacent cheek and jaw line. There was a laceration of the right eyebrow at the lateral aspect, a splitting of the skin. A laceration is a splitting injury of the skin to the bone. There were fractures of the facial bones on the right; that is, the maxillary

the time of death as between 6 and 10 p.m. The defendant seizes on the examiner's uncertainty about the time of death and assumes that the victim was dead when he was placed in the DiPaolo automobile. With that assumption as his starting point, he insists that this case involved nothing more than a heated argument between himself and the victim, exacerbated by the consumption of alcoholic beverages, that unfortunately led to a fatal enounter in the parking lot. He further contends, however, the the evidence that brutal injuries were inflicted during the 10 minutes he and the victim were in the parking lot, absent a showing of a prior relationship indicating a motive for killing or a preconceived plan to kill, cannot support a finding of the premeditation and deliberation required by *Fenik* for first degree murder.

---

sinus bones were fractured, depressed or pushed in. There was an open, jagged laceration of the nose at about where I'm pointing with my finger, with bruises of the nose and fracturing of the bones. There was a contusion of the — or bruise — of the middle of the forehead. There was a splitting or laceration of the upper left lip, splitting of the skin of the right upper and lower lip with bruising and splitting inside the lip with swelling. There was a laceration or skin splitting of the chin in about the area I'm pointing with my finger. There are bruises about the ear with several skin splittings of the ear, lacerations of the ear, with a portion of the ear lobe split loose, hanging loose, and splitting of the back of the ear as well. There are bruisings of the side of the — right side of the neck as well as some bruising of the left neck, extending into the mid line. There is a somewhat patterned bruise or contusion of the left posterior lower scalp. There are two linea streaks that are curved. When an instrument of some kind strikes the skin, it pushes blood from the center to the sides and forms a streak, and this was about ¾ths of an inch in greatest width at the left back of the scalp. Then there is another bruise of the right lower scalp at the back near the mid line and other bruises of the left scalp, covering an area of about five and a half by two and a fourth inches of the left posterior scalp. There was a faint bluish bruise of the right lower chest in about the area I'm pointing with my finger. There was a bruise across the right shoulder near the junction with the neck. There was a gray bruise over the left clavicular area in about the area I'm pointing with my finger. There were two small blue bruises of the knees. A faint blue bruise of the right upper leg near the junction with the body."

Her internal examination of the body revealed extensive hemorrhaging including a hematoma pocket in the posterior lower scalp area. The lungs were filled with blood; the abdomen containing almost one pint of free blood. His liver was ruptured.

The defendant's argument, however, is premised on evidence that is favorable to him. But when we review a denial of a motion for direction of a judgment of acquittal, we must assess the evidence most favorable to the state. Viewed in that light, the evidence suggests that death could have occurred in the Barrington park and not in the Pawtucket parking lot. Indeed, defendant's own handwritten confession, which was admitted into evidence at the trial, states:

> "I drove somewhere near [R]umford, near the tracks don't know where or if he got to the stone where the cross was, in the cemetery, and probably won't ever know to this day. He asked me to smack him, and told me he didn't want to live anymore, so he was still alive, and wanted so I smacked him, I guess I kicked him out."

The confession, considered in conjunction with the medical evidence, could support a jury finding that the victim was alive when the trio arrived at the Barrington park,[2] that defendant had adequate time during the 20 minute trip from Pawtucket to develop a conscious design and intent to kill the victim, and that blows struck at the park were a contributing cause of death.

In sum, the trial justice did not err in denying the defendant's motion for a direction of a judgment of acquittal on the charge of first degree murder.

The defendant's appeal is sustained, the judgment appealed from is reversed, and the case is remanded to the Superior Court for a new trial at which the jury shall not be precluded from considering whether the defendant is guilty of murder in the first degree by reason of any ruling of the trial justice at his original trial.

---

[2] Other evidence that might support this finding include a taped interview of the defendant by state police detectives, testimony by one of those detectives regarding various statements made by the defendant, testimony by DiPaolo that the defendant punched the victim during the ride to Barrington, and testimony of a prison acquaintance of defendant's.

*Dennis J. Roberts II,* Attorney General, *Nancy Marks Rahmes, Special Assistant Attorney General,* for plaintiff.

*Hanson Curran & Parks, Dennis J. McCarten,* for defendant.

401 A.2d 426.

STATE *vs.* DAVID CONTILDES.

MAY 1, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. The defendant, David Contildes (Contildes), is before us on his appeal following his conviction by a

Superior Court jury of a variety of charges, all of which arose from the March 11, 1976 Thursday evening holdup of the Marquette Credit Union's Cumberland branch office. The appeal revolves around one single issue, to wit, whether Contildes' constitutional right to a fair trial was violated by the prosecution's alleged failure to reveal to him certain exculpatory evidence.

The exculpatory evidence consists of a written statement given to the police by Albert E. Forkey (Forkey), who in the winter of 1976 worked in Woonsocket as the bartender at the Dugout Cafe (Dugout). The Dugout played an important before-and-after role in the March 11 robbery. It will be obvious to the reader that there were times when some of the Dugout's clientele thought and talked about things other than batting averages, pitching performances, and the Red Sox' chances of ever again winning an American League pennant.

The prosecution's star witness was John B. Daniels (Daniels). Daniels was a coindictee of Contildes, but 2 days before trial began he withdrew his not-guilty pleas and in their place substituted twelve nolo pleas. He gave the jury a blow-by-blow description of the events which led to the courtroom confrontation between Daniels and Contildes. According to Daniels, he and Contildes got together at the Dugout on March 10 and planned the holdup. On the following day at about 6:15 p.m. they drove to the parking lot across the street from the Dugout, picked up a stolen light blue 1965 Pontiac Catalina, and headed for Marquette's Cumberland branch. Once the duo arrived at the credit union, they put on ski masks and then went about their appointed tasks. Daniels took care of the crowd-control problem as he leveled a .44 magnum rifle at the customers and employees. Contildes took care of the collection as he vaulted over the counter and stuffed all of the available cash into a cloth bag. The police arrived on the scene just as Daniels and Contildes sped away. The noise from an exchange of gunfire between the bandits and the police caused several people who lived alongside the credit union to take a

look at what was going on. Two of the onlookers were teenagers. They appeared in court and described the getaway vehicle as a 1967 light blue Pontiac bearing a Rhode Island registration plate which read: "SO 321."

Among the other Dugout patrons were Steven Cook (Cook) and Robert E. Perrault (Perrault). Cook testified that on the night before the holdup Contildes had agreed to pay him $200 if Cook would furnish him with a stolen car. The next day Cook and Perrault stole the Catalina and attached to its rear bumper a stolen Rhode Island license plate that contained two initials and three numbers. Perrault could not remember the exact sequence, but he did say that the plate contained an "S" and the figure "321." Cook parked the Pontiac in a parking lot across the street from the Dugout. He and Perrault repaired to the bar. Contildes showed up at the Dugout at about 6 p.m. After being shown the Pontiac, he left the area in his own automobile. Sometime later when Cook looked out the window, he saw Contildes and another individual in the parking lot. A bit later when Cook gave the area a second look, he noticed that the Pontiac had disappeared. Testimony by Cook and Perrault indicated that Contildes reappeared at the Dugout somewhere within the 7:30 to 8 p.m. time range.

Perrault reported that in the ensuing hours after Contildes' return, he (Perrault) operated a shuttle service between the Dugout and various points in the Woonsocket-Cumberland area. Contildes was first taken to his Woonsocket apartment for a change of clothes. On the way, he told his companions that they had just "knocked off a loan company." After the trio returned to the Dugout, they once again journeyed over to Cumberland for the express purpose of picking up Daniels at a cemetery. On their way, they stopped at a parking lot of a Woonsocket bowling alley, where Contildes had abandoned the stolen Pontiac. He removed the stolen plate from the Pontiac and returned to Perrault's automobile. As they proceeded along Woonsocket's Main Street bypass, Contildes folded the plate in half and pitched it into the Blackstone River. At about 11 p.m. they made the cemetery pickup and

returned to Contildes' apartment. As they traveled the highways, the car radio informed them that the police had reported the credit union robbery to have netted the thieves about $2,000.

At the apartment Daniels put the credit union's cash on the table, and the loot was divided. Cook and Perrault each received $100, Daniels and Contildes split the balance of approximately $1,200. Nobody sought an explanation of the $600 difference between the $2,000 police report and the $1,400 brought to the apartment by Daniels.

Perrault then drove Cook, Daniels, and Contildes to the Dugout. Following a midnight libation, Daniels and Contildes took leave of the establishment. As they did, Daniels was arrested by the Woonsocket police. A search of Daniels produced $623 in cash. A check of the credit union's records revealed that $200 of that amount had been in the tellers' stations at the time of the robbery.

The evening of March 11, 1976, marked a high point in the Dugout's weekly social calendar because the bar's pool tournament took place during that time. Forkey, the bartender, testified that twenty-four players using one table participated in a tournament which began at 7 p.m. and ended 2 hours later. When asked if Contildes was present for the entire tournament, Forkey replied: "I don't know for sure. To the best of my knowledge he was there from seven to nine for the tournament." During cross-examination Forkey was asked whether Contildes, Cook, and Perrault were in the bar at 6 p.m., and he replied that it was "possible," but he could not swear to it because the large turnout of spectators and participants made it difficult "to keep track of them all." When confronted by the defense with a statement in which he told the police that Contildes, Cook, and Perrault had remained at the Dugout from 6 p.m. until midnight, Forkey replied: "I believe they were, if that's what it says there." The bartender clarified his earlier testimony about Contildes' being in and out of the bar by stating that the ins and outs occurred during the post-tournament period. On redirect

examination, Forkey conceded that someone could have left the Dugout and returned without his ever being aware of such an event.

The defense presented an alibi witness. Donald Marks (Marks) told the jury that his tournament opponent was Contildes. Marks stated that Contildes arrived at the bar shortly after 6 p.m. and he and Contildes confronted each other twice during the tournament. Each time Contildes was victorious. If Marks is to be believed, while Daniels was shooting at the police in Cumberland, Contildes was in Woonsocket shooting pool.

The owner of a 1965 Pontiac Catalina, whose car was stolen from the Woonsocket Plaza parking lot on March 11, 1976, recovered his car the following day from the state police. It was the getaway vehicle. The owner told the jury that while he considered his car to be light green, concededly it could be described as light blue. The police recovered the folded plate. It was issued by the Rhode Island Registry of Motor Vehicles and reads "SU 321."

The statement given to the police by Forkey was introduced into evidence. It refers to the night of March 11 and states as follows:

> "Steve Cook, Dave Contildes, and Bob Perrault were here between the hours of 6 and 12 except for Steve Cook who was here at closing time at 1 o'clock at which time the State and city police came in and asked if I would bring my bills to the station to be examined which I did. Contildes was here to play his games in the pool tournament that begins at 7 to 9 but I could not say that he was here at 7 o'clock or not but he was in and out a few times in the course of the night. Dave Contildes played two games of pool in the tournament against Don Marks. [T]he tournament is run by Dick Thifeault. [H]e would probably have a rough estimate of the time he played his games."

Contildes' counsel classifies this document as being

exculpatory because it indicates his client was in the bar at various times during the night of the robbery and identifies two individuals who might have been able to corroborate this fact. Although Contildes failed to make any effort for pretrial discovery,[1] he now contends that the state's failure to provide him with this statement prior to trial "significantly prejudiced" the full development of his alibi defense, thereby depriving him of a fair trial.

We have previously recognized that the suppression or non-disclosure of evidence favorable to the accused can give rise to an error of constitutional proportions. *In re Ouimette*, 115 R.I. 169, 174, 342 A.2d 250, 252 (1975). In *Ouimette*, we discussed *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), where the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S. Ct. 15 1196, 10 L. Ed. 2d at 218. However, we noted that *Brady* left two questions unanswered: first, just what evidence was "material" enough to require a new trial, and second, whether its holding was based solely upon the fact of a specific request for clearly defined evidence.

In *Ouimette*, we pointed out that the prosecutorial duty to disclose serves not only as a reminder to counsel for the state that the primary purpose of a criminal trial is the search for truth but also acts as a safeguard against the injustice which can arise when a guilty verdict results from a situation where relevant facts are not produced for the factfinders' consideration. In attempting to balance these goals against society's

---

[1] Contildes' appellate counsel was not his trial counsel. The absence of any effort in the discovery area might have been part of trial strategy. If Contildes had sought discovery pursuant to the terms of Super R. Crim. P. 16, he would have been obligated, upon written request, to furnish the state with the evidence and information he expected to use at the trial, including the names and addresses of any witnesses who might be presented to establish an alibi defense. *State* v. *Silva*, 118 R.I. 408, 409, 374 A.2d 106, 107 (1977).

interest in the prompt final disposition of criminal prosecutions, we adopted the "significant chance" rationale which was employed by the Second Circuit in *United States v. Kahn,* 472 F.2d 272 (2d Cir. 1973). In *Kahn,* the court took the position that where there is no intentional deceit and no pretrial request for specific evidence, but hindsight discloses that the defense could have put the evidence to good use, the defendant, while not obliged to show the probability of a different verdict upon retrial, must show there is a significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. *In re Ouimette,* 115 R.I. at 179, 342 A.2d at 254-55.

Almost a year after our decision in *Ouimette,* the Supreme Court expanded on the constitutional requirement of pretrial discovery. In *United States v. Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the accused was convicted of second-degree murder after a jury refused to find that she had acted in self-defense. Although no pretrial request was made, the accused argued that she was denied a fair trial by the prosecutor's failure to disclose certain information about the victim which tended to support her theory of self-defense. Before defining the standard of materiality giving rise to the prosecutor's constitutional duty to volunteer exculpatory matter to the defense, the Court commented briefly on the function of the request.

Where there is a specific request informing the prosecutor of just what evidence the defense desires, the Court concluded that failure either to furnish the information or to submit the problem to the trial judge would seldom, if ever, be excused when the evidence is material or there is substantial basis for claiming materiality. On the other hand, when the defense makes a general request for "all *Brady* material," the prosecutor's duty to disclose can only derive from the "obviously exculpatory" nature of the evidence in his possession. The Court applied the same rationale to cases

in which no request is made since in both instances the prosecution has little, if any, notice of what the defense desires.

There being no request made by the defense in *Agurs,* the Court articulated a standard of materiality virtually identical to that adopted by us in *Ouimette.*[2] According to *Agurs,* materiality is the keystone of the constitutional duty to disclose and is measured by the following standard:

> "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112-13, 96 S. Ct. at 2402, 49 L. Ed. 2d at 355,

We now consider Contildes' contention in the light of this guideline.

Contildes identifies the two additional witnesses listed on Forkey's statement as his adversary, Marks, and the tournament director, Dick Thifeault. However, as noted earlier, the jury heard Marks' testimony about Contildes' whereabouts. Forkey's statement indicates that Thifeault "would probably have a rough estimate" of the time when Contildes participated in the tournament. Again, Marks had

---

*Dennis J. Roberts II,* Attorney General, *Nancy Marks Rahmes,* Special Assistant Attorney General, *John S. Foley,* Special Assistant Attorney General, for plaintiff.

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Edward N. Beiser,* for defendant.