STATE *vs.* CLARE M. COLVIN *et al.*

JULY 23, 1954.

PRESENT: Flynn, C. J., Baker, Condon and O'Connell, JJ.

BAKER, J.   This is an indictment charging that Herbert
F. O'Rourke and Clare M. Colvin on November 24, 1950
did enter in the nighttime the dwelling house of Levon M.
Juskalian and Irene Juskalian with intent to commit lar-
ceny.   Herbert F. O'Rourke pleaded nolo contendere and
was sentenced.   In the superior court Clare M. Colvin,
hereinafter termed the defendant, was found guilty by a
jury and her motion for a new trial was denied by the
trial justice.   The case is before us on her bill of exceptions
containing a number of exceptions, only two of which are
now pressed.   These are the twenty-first and twenty-
second, being respectively to the failure of the trial justice
to direct a verdict of acquittal and to grant her motion
for a new trial.   Her other exceptions not being briefed or
argued are deemed to be waived.   The defendant, who was
represented by counsel from the beginning, does not con-

tend that she was deprived of any rights under the federal or state constitutions.

The instant indictment, in keeping with the law of *State v. Patriarca*, 71 R. I. 151, 155, 156, clearly charges defendant with being a principal in the alleged offense. In that case this court in considering two indictments against the defendant therein as an accessory before the fact to two murders had occasion to make the following statement: "The common-law distinction between principals and accessories in felonies still holds in this state. * * * In this state it is still the law that an indictment for a felony must charge a person as a principal or as an accessory before the fact, according to the facts; and that on an indictment which charges the defendant as principal he cannot be convicted on evidence showing that he was merely an accessory, or *vice versa* * * *." It is vigorously argued on behalf of defendant that whatever the evidence may show as to her conduct in connection with the charge, it falls short of establishing beyond a reasonable doubt that she acted therein as a principal rather than as an accessory. That is the chief issue raised here. The state argues there is ample evidence to support the verdict.

It is unnecessary for the disposition of this case to set out all the evidence in detail. It appears from the testimony that in the winter of 1950-1951 defendant was living in the city of Cranston with her husband, a truck driver, and her twin daughters by an earlier marriage, who were about eight years of age. Herbert F. O'Rourke, who was married but living apart from his wife, boarded with the Colvins. There was testimony which tended to show that defendant had seen Irene Juskalian wearing two rings with large diamonds; that she had asked O'Rourke to get them for her; and that in October and November 1950 when riding they frequently drove past the Juskalian house which was located in the Meshanticut Valley Parkway in Cranston.

For some time defendant's car had been under surveillance by several town and state police officers in connection with suspected thefts. On the morning of February 3, 1951 members of the Rhode Island and Connecticut state police went to defendant's home for the purpose of investigating such thefts. She and her children were the only persons at home. The defendant herself opened the door and invited them into the house. Thereafter the Massachusetts state police also went to the house. Later that morning the Cranston police in investigating the instant crime joined them. She was present at all times and although she knew that they were police officers she made no objection to their search of the house. As a result thereof a great quantity of stolen articles such as antiques, clothing, clocks, china and the like were discovered therein. Further, a member of the Cranston police found in the lower left corner of the bottom drawer of a dresser in the downstairs bedroom the jewel box of Irene Juskalian containing costume and inexpensive jewelry. This box and its contents were later identified by Irene Juskalian as belonging to her and there was other testimony, in addition to defendant's statement, that she had control of this box and previously put it in that bedroom dresser.

About noon defendant was driven by the officers successively to several Rhode Island state police barracks where particular thefts were under investigation. Questioning of her was only at intervals in order to check certain facts. Since they had not connected her with any such thefts, she was finally released and late that night was taken home by the state police. Thereafter about midnight the Cranston police took her to their headquarters in connection with their investigation of the instant crime. The interrogation there was considerably delayed by several explained interruptions. Early in the morning of February 4 defendant finally completed her statement with reference to the planned entering of the Juskalian house on the evening of

November 24, 1950 for the purpose of committing larceny. That statement, which was entirely voluntary and made without threats, duress or any inducement, was signed by her after she had read it and had made certain corrections. It was introduced in evidence as the state's exhibit 5 and reads as follows:

"Cranston Police Hdqts. Cranston, R.I. February 4, 1951

This is a true and accurate statement given to Insp. A.J.Moretti in the presence of Chief L.B.Fouchecourt by Clare M. Colvin age 29 45 Scituate Ave. Cranston in regards to her activities concerning the series of house breaks in the City of Cranston.

Q. What is your full name. age and date of birth ?

A. Clare M. Colvin, age 29, date of birth 2/22/22.

Q. Where do you live ?

A. 45 Scituate Ave. Cranston, R.I.

Q. Who do you live with ?

A. My husband Edmund L. Colvin age 33 and Herbert F. O'Rourke age 27 and my twin daughters Merrilyn Lee and Sandra Lou both 8 yrs. of age.

Q. Do you own a beach wagon ?

A. I do it is a 1949 Ford Station Wagon R.I.Reg. E-454.

Q. Have you driven your beach wagon in the City of Cranston ?

A. Yes.

Q. Will you tell me just what took place on some of the times that you drove your beach wagon ?

C.M.C. A. On Nov. 25,1950 at about 7:00 P.M. I drove the beach wagon and my husband and O'Rourke and my 2 daughters were with me, we drove to in front of 78 Meshanticut Valley Parkway and as this house was in darkness I stopped the beach wagon and both my husband and O'Rourke got out, they had a crow bar with them and they each had a flashlight and they busted a window and entered the house and returned in a few minutes with a

jewelry box that had an assortment of cheap jewelry. I then drove home and placed this box in my bottom dresser drawer.

This happened Nov. 24, 1950   C M C

Q. Is there anything else that you wish to·add to this statement ?

A. No.

Q. Is this statement taken given of your own free will without threats by the Police ?

A. Yes

Signed

[Signed] Clare M. Colvin

[Signed]  Anthony J. Moretti  Age 29

45 Scituate Ave"

Information thereafter received by the Cranston police concerning her husband caused them to re-examine defendant on February 6, 1951. They told her that he was not present at the Juskalian ·break and asked why she had implicated him. Her answer in substance was that she wanted him to be in as deep as O'Rourke. According to the testimony of the inspector and other members of the Cranston police, she stated that the true story was that she and O'Rourke planned the crime; that on the way they agreed if the house was in darkness he would enter it and look for the diamond rings; and that she agreed to drive the car away from that vicinity and return in five or ten minutes. She further told the police that the house was dark, O'Rourke got out of the car, she gave him a crowbar, and drove away from the vicinity. She then said she returned in about ten minutes, parked a distance away from the house, and when O'Rourke beckoned she drove to where he was, picked him up and started toward her home. The above statement made by defendant to the Cranston police was oral and she did not give it until they agreed not to put it in writing or to ask her to sign it.

It is well settled that upon a motion for a directed verdict by a defendant in a criminal case the evidence must be

viewed in the light most favorable to the state. *State* v. *Wright,* 70 R. I. 39; *State* v. *Lorenzo,* 72 R. I. 175. The state introduced independent evidence which sufficiently tended to establish the *corpus delicti,* that is, the body of the crime, and also exhibit 5, the statement signed by defendant. In support of her motion for a directed verdict, she argues in effect that the credible evidence indicated that at most she might have been an accessory, since she drove O'Rourke to the scene of the crime and then, according to her oral statement, drove away and returned later to pick him up, but that there was no evidence to go to the jury on the charge that she had acted as a principal. In so arguing she not only views the evidence most favorably to herself, contrary to the rule, but also takes the position that exhibit 5 is valueless as evidence because it was not a true narrative of what took place on November 24, 1950. We are unable to accept her contention that such exhibit should be entirely disregarded as to the issue now before us.

The fact that it is admitted the defendant's husband took no part in the actual commission of the crime and that the written statement is *to that extent* incorrect does not necessarily as a matter of law invalidate the *entire* statement contained in said exhibit. It was possible for the jury, after considering all the circumstances, to accept part of the signed statement as true and to reject another severable part thereof. Reading the portion of exhibit 5 describing defendant's own conduct at the time the crime was committed, apart from who else may have been present, and giving the language therein its ordinary meaning, it is clearly proper for the state to contend and the jury to find that such written statement either expressly or by reasonable inference placed defendant as waiting in her car directly outside the Juskalian house while the crime was taking place. Certainly there was no definite statement in the exhibit that she drove away and did not return until after the crime had been committed. If she so waited she

would be a principal under the law and would come within the charge laid in the indictment.

It was for the jury to pass upon the meaning to be given to exhibit 5 in whole or in part, to decide what weight should be accorded to it, and to determine whether it was a correct statement of defendant's own conduct and participation in the crime. It is our opinion that on the whole record there was evidence to go to the jury on the charge in the indictment and that the trial justice did not err in denying defendant's motion for a directed verdict of acquittal. The twenty-first exception is overruled.

The defendant's motion for a new trial was based on the usual grounds. The transcript shows that she did not testify. In regard to her contention that the verdict was against the law as given to the jury by the trial justice, it is our opinion that such contention is without merit. No exception to the charge was taken by defendant and it therefore became the law of the case. At its conclusion her attorney said: "This is one of the few cases I have been in where I have no exception to Your Honor's charge, and I am fully satisfied with it." However, she relies for support of her above contention on the fact that while the jury was out considering the case it requested the trial justice for further instructions as follows: "It is the understanding of some of the Jury that by the defendant being away from the crime while O'Rourke was in the house, namely, driving around for a period of 10 to 15 minutes; that this absolves the defendant of the charge."

The trial justice answered the request correctly, repeating in substance what he had already told the jury in respect to the effect of the presence or absence of defendant while the crime was being committed as bearing on the question whether she participated therein as a principal. Thereafter the jury remained out for several additional hours and then returned their verdict of guilty as charged. She argues that if some of the jury were of the opinion that defendant

was driving around while O'Rourke was in the house as the request would indicate, they could not under the law given them find her guilty of being a principal. That conclusion, however, does not follow. The defendant assumes that some of the jurors were *in fact* of that opinion when the above instruction on the law was asked, and also that they necessarily were of the same belief when the verdict was rendered. This assumption is erroneous and is contrary to fact. Following the request and the court's second clear instruction thereon, even if some jurors had such an understanding they could well have taken a different position after further consideration and before the verdict was returned. From the unanimous verdict and the answer of each juror as he was specially polled it appears that all were then of the belief that defendant was in fact present while the crime was being committed.

The defendant also urges that the verdict was against the evidence and the weight thereof and that the trial justice so indicated when he was considering her motion for a new trial, although he refused to grant it. The transcript shows that he gave a long oral decision on the motion and considered carefully all phases of the evidence. In support of defendant's argument that he failed to exercise his independent judgment as required by law, she has called to our attention a large number of excerpts from the decision which excerpts are not always closely connected and at times are out of context. It seems that he expressed some surprise at the verdict, stating that he personally would place little stock in anything that O'Rourke had said. At the same time, however, he expressly recognized that the jury would have a right to believe O'Rourke.

He also said in substance that the case really turned on an explanation of what he termed as the "two confessions," that is, defendant's signed written statement and her oral statement subsequently made. At the conclusion of his decision the trial justice used the following

language in referring to the jury: "* * * they found that she was present applying the rule that I gave, which was not excepted to, and I think it was the correct rule and I think they were justified legally in so doing because they could, as I have already indicated, take the first statement in writing and she had a chance to read it and sign it. * * * I think the verdict is not against the law and it is not against the evidence, not against the law and the weight of the credible evidence. I deny the motion * * *."

It is clear from the whole decision that the trial justice realized that the defendant's two statements would play an important part in the jury's verdict. In determining whether she was constructively present at the commission of the crime, which was the controlling issue in the case as far as defendant was concerned, the jury would have to decide, after considering both statements, where the truth lay. Whether her husband was present or absent did not affect the fact that O'Rourke was admittedly present and that defendant signed a written statement that she waited outside while he was committing the crime. The issue was as to her own conduct and not that of her husband. It seems obvious that on that question in the final analysis the jury accepted substantially the written statement as to her presence while the crime was being committed and if so there was adequate evidence legally to support the verdict, as the trial justice stated.

It is our opinion that the trial justice exercised his independent judgment in deciding the motion, and also recognized and applied the well-settled rule that, even if his own judgment might incline him to another conclusion on one phase of the evidence, he was not entitled to merely substitute his view of contradictory evidence for that expressed by the jury's verdict, especially where different minds could naturally and fairly come to different conclusions on such evidence. Considering his entire decision, we are of the opinion that at no time did he indicate that the

verdict was contrary to law, or that it failed to respond to the real merits of the case and do substantial justice, or that it was against the weight of the evidence that is necessary in a criminal case. In fact he concluded expressly that the verdict was not against the law or the credible evidence. Further we find nothing to show that the trial justice overlooked or misconceived any evidence in reaching his final and independent conclusion on the motion for a new trial. In the circumstances we cannot say that such decision was clearly wrong. The defendant's twenty-second exception is therefore overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

## On Motion for Reargument.

### AUGUST 6, 1954.

Per Curiam. After our opinion herein was filed the defendant asked and received permission to present a motion for leave to reargue the case. Pursuant thereto she has filed such a motion setting forth certain reasons which she contends require a reargument.

We have examined those reasons and after consideration we are of the opinion that nothing has been stated therein which was not considered by this court or which warrants a reargument. As a premise for some of her conclusions or reasons defendant makes certain statements of the law as if our opinion held to the contrary. A reading of the opinion as a whole will show that this is not the case.

Furthermore, as indicating an alleged erroneous view of the law to be applied in deciding a motion for a new trial in a criminal case, she singles out certain statements by the trial justice to the effect that the verdict was not contrary to the weight of the credible evidence. But in this contention she overlooks the fact that she has separated the trial justice's statement from its immediate context. The complete holding in ruling on the motion for a new

trial leaves no doubt that his statement as to the verdict and evidence was made expressly in the light of the law which he had given to the jury and such instruction contained the fundamental rule requiring proof of guilt beyond a reasonable doubt.

What was clearly intended by the trial justice and by this court in referring thereto, all of which is implicit in our opinion, is that if the jury believed the defendant's written and signed statement, as they had a right to do, then such statement together with the other evidence was adequate to exclude the hypothesis of her innocence and to prove beyond a reasonable doubt that she was present during the commission of the crime as charged.

Motion denied.

*William E. Powers*, Atty. Gen., *William J. Counihan, Jr.*, Ass't Atty. Gen., for State.

*Aram A. Arabian*, for defendant.