405 A.2d 1161.

STATE *vs.* JAMES EDWARDS.

AUGUST 20, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   The defendant, James Edwards (Edwards), appeals from a judgment of conviction entered by the Superior Court after a jury found him guilty of robbery. On appeal, Edwards raises several issues which call into question certain rulings made by the trial justice.  Specifically, we are concerned with a motion to suppress eyewitness-identification testimony, a motion to pass the case and declare a mistrial, and a motion for new trial.

The facts are as follows. During the cloudy midafternoon of October 30, 1975, the Baker Street branch of the Rhode Island Hospital Trust National Bank was held up by a man and a woman. (Baker Street is located in the Washington Park section of Providence.) About a year later a secret indictment was filed, charging Edwards with the theft of a sum just in excess of $4,400. The indictment against Edwards was based in large part on the grand-jury testimony of Sharon Hampton (Hampton). She had also been charged with the October robbery and apparently agreed with the state to testify against Edwards in a attempt to avoid incarceration.  However, on March 1, 1977, the day Edwards' trial was scheduled to begin, Hampton was no-where to be found. Her last-minute disappearance forced the state to rely upon Peter S. Greenberg (Greenberg), a customer in the Baker Street branch at the time of the robbery, to identify Edwards as the thief.

Shortly before the trial commenced, Greenberg was called into the prosecutor's office, shown six mug shots, and asked if he could identify one of them as depicting the man he had observed inside the bank some 16 months earlier. Within seconds, Greenberg identified the fifth photo as the one representing the robber. When the trial was about to begin, the prosecutor informed the court and defense counsel of the

out-of-court photo display and stated that he planned to elicit identification testimony from Greenberg during the course of the trial. The defense immediately moved for a voir dire to determine the admissibility of the incourt identification and objected to the prosecutor's "eleventh hour" maneuver on the ground that it had violated defendant's right to counsel.

Greenberg was the hearing's only witness. He is the national sales manager for a manufacturer located near the bank. He testified that when he arrived at the bank about 2 o'clock, he observed a man and a woman arguing near the front door. Greenberg said he passed within a few feet of the couple and was able to get a "good look" at the man. He described him as a young man in his mid-twenties, about 6 feet tall, wearing brown elevated shoes, a black leather-type trench coat, and a hat, which rested atop a "semi-Afro." Greenberg entered the bank and was apparently in the midst of preparing a deposit slip when he heard someone say, "Hands off the buttons. Move away. Put the money in the bag." When he turned around, he observed the man he had just seen outside the bank now waving a gun around and adjusting a dark green scarf over the lower portion of his face. At that time, he was able to see that the man had a receding hairline and long, curly black sideburns resembling an "inverted triangle."

Greenberg testified that the gunman ordered all the customers to one side of the bank while the woman went from teller to teller and collected the cash. Greenberg thought she looked a bit younger than her armed companion and noticed that she too wore a scarf over her face. He estimated that the entire incident lasted 10 or 15 minutes. When the police arrived, Greenberg gave a statement and informed them that he could "probably" identify the man if he saw his picture. During the next few months, Greenberg was shown hundreds of photos by the Providence police and agents of the Federal Bureau of Investigation. However, he was unable to identify any of them as the man who brandished the gun on October 30.

Greenberg told the trial justice that upon his 1:30 p.m. arrival at the courthouse for a trial that was to begin at 2 p.m., he was met by the prosecutor and Sergeant Gilbert Ethier of the Providence Police Department. At that time, Sergeant Ethier shuffled the six photos and handed them to Greenberg, saying, "Look at these pictures. * * * [S]ee if you can pick out the person in these pictures." After viewing all six photos, Greenberg dropped one on the table and said, "This is the person." Greenberg had identified Edwards as the thief.

The prosecutor told the trial justice that once the trial began, he would rely solely on Greenberg's in-court identification of Edwards. The trial justice rejected any defense claim that the photo exhibit that had taken place in the Attorney General's department was impermissibly suggestive and denied Edwards' motion to suppress. In addressing the right-to-counsel argument, the trial justice conceded that he had difficulty understanding the general rule that counsel need not be provided at a photographic display; however, he felt constrained to apply that rule to his interpretation of the state's constitution.

The general rule referred to by the trial justice was enunciated in *United States* v. *Ash,* 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973), where the Supreme Court held that the sixth amendment to the Federal Constitution did not guarantee an accused the right to counsel at photographic displays at which a witness attempts to identify a suspect. The Court limited that sixth-amendment right to "trial-like confrontations," such as corporeal identification where an accused is physically present. On appeal, Edwards asks that we adopt a higher standard of protection by relying upon the assistance-of-counsel guarantee afforded by the declaration of rights embodied in art. I, §10, of the Rhode Island Constitution. We have in the past taken a similar course of action. *See State* v. *Maloof,* 114 R.I. 380, 389, 333 A.2d 676 681 (1975).

Recently, in *State* v. *Delahunt*, 121 R.I. 565, 401 A.2d 1261 (1979), (Mr. Chief Justice Bevilacqua and Mr. Justice Kelleher, dissenting), the majority of this court adhered to the principles set forth in *Kirby* v. *Illinois*, 406, U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), and held that under our art. I, §10, an accused is entitled to counsel only at a postindictment lineup. Much of what was said in *Delahunt* could be repeated here. Suffice it to say, however, that the majority in *Delahunt* is not yet persuaded that the potential for abuse and the problems of misidentification in the use of photographic displays are so great as to require the presence of counsel. Accordingly, this court holds that the state constitution provides no right to counsel at a post-arrest photographic display.

Edwards presented an alibi defense. As his first witness he called Glenn Miller, who lives and works in St. Louis, Missouri. In direct examination he told the jury that during the fall of 1975 Edwards was in St. Louis. He remembered Edwards' being there on October 30 because October 29 is his wife's birthday, and all his friends, including Edwards, attended a birthday party in the Millers' apartment that ended sometime in the early morning of October 30. According to Miller, Edwards returned later in the day and spent the afternoon at the apartment. During cross-examination Miller made clear that he first met Edwards in 1967 and then occasionally played basketball with him. Miller stressed that he was closer to Edwards' brother, Bruce, and that up to 1974 he had not considered Edwards a friend. When the prosecutor then asked Miller what happened in 1974 to turn an acquaintanceship into friendship, Miller replied: "Cause he had just did some time and got out and seemed like he had his head together."

A motion to pass was immediately made, and it was followed by a denial. In denying the motion, the trial justice observed that the state had the right to inquire into the friendship transformation and that it should not "be penalized because a witness volunteered something that is not sought." After an extended colloquy between the trial

justice and counsel, the trial justice remarked: "Well, I think I'm going to inquire of the jury. They've heard the answer and if we've got people here who cannot render a fair and impartial verdict on that basis, I'm going to disband this jury." A further exchange followed, and finally Edwards' counsel asked that there be an individual voir dire of the jury. The responses of two of the jurors give rise to this facet of Edwards' appeal. As each juror was brought into the courtroom, the prosecutor's inquiry about what caused Miller in 1974 to look upon Edwards as a friend and Miller's reply were read to him or her.

During the voir dire of one juror, the following exchange occurred:

"The Court: Do you still presume the defendant to be innocent here, notwithstanding he may have—assuming he was—in prison?

"Juror* * *: Well, yes to a certain degree, yes.
* * *

"The Court: What do you mean by a certain degree?

"Juror* * *: Well, there are, I guess facts that go the other way, too.

"The Court: Well, you understand that you're not supposed to make a judgment until you have * * * the collective benefits of your fellow jurors deliberating on this case?

"Juror* * *: Yes.
* * *

"[Defense Counsel]: And at this particular point, do you feel that the State has proven that Mr. Edwards is guilty?
* * *

"Juror* * *: That's a tough question.
* * *

"The Court: Well, the question is, have you already
made up your mind?
\* \* \*

"Juror\* \* \*: Yes, in a way. You know."

The trial justice then said that he would not accept the juror's response and admonished him that jurors cannot decide a defendant's guilt or innocence until they have listened to all the evidence and the charge. The juror told the trial justice that he had not made up his mind and that he still presumed Edwards to be innocent.

The defense counsel asked that a second juror be excused after the following colloquoy:

"[Defense
Counsel]: Do you feel, \* \* \* that assuming it to be
true that my client was in prison in 1974,
that that helps to kind of bolster up the
State's case as you've heard it up to this
point?

"Juror\* \* \*: Well, I'd have to say that it doesn't help.
\* \* \*

"[Defense
Counsel]: Well, in what way doesn't it help my
client for you to have heard that
statement? Could you clarify that for me
please?

"Juror\* \* \*: I really don't know. I would say it would,
his character, his past record—."

Once again the trial justice informed the juror that evidence of previous incarceration could not be used to decide the issue of guilt or innocence. The juror then stated that Miller's "did some time" remark would not, in his mind, hurt defendant. The trial justice denied Edwards' request that the two jurors be excused, saying he was convinced that they remained impartial.

We have said on many prior occasions that deciding whether to declare a mistrial is a discretionary function of the trial court. The trial justice has a front-row view of the trial which we do not have. Thus, he or she is better able to assess the degree of prejudice and the effectiveness of curative judicial instructions. There is no fixed formula to determine whether the prejudicial taint has been removed. Each case must be decided on an *ad hoc* basis, and each challenged remark must be viewed in the context in which it appeared and in light of the surrounding circumstances. A mistrial will be ordered at the appellate level only if we are convinced that the cautionary instructions were untimely or ineffective, or if the improper material had been so indelibly inscribed upon the jurors' minds that, despite the trial justice's timely action, the jurors' minds could not be disabused of the prejudicial effect. *State v. Gianoulos,* No. 77-312-C.A. (R.I., filed July 27, 1979); *State v. Freitas,* 121 R.I. 412, 416, 399 A.2d 1217, 1219, (1979); *State v. Marrapese,* 116 R.I. 1, 7, 351 A.2d 95, 98 (1976); *State v. Pailin,* 114 R.I. 725, 729, 339 A.2d 253, 255 (1975).

Here, the trial justice conducted the individual voir dire and, as noted before, engaged in a long discussion and, when necessary, took the proper steps to dispel the prejudicial taint of Miller's response. Later, in his charge he advised the jury to exclude the matter completely from its consideration.

In this case, we have a bank robbery made unusual by the robbers' decision to have an argument before donning their masks and going about their nefarious activities. Unfortunately for Edwards, Greenberg was an eyewitness to the argument and to their entry into the bank. Part of the record in this case consisted of pictures taken by the automatic cameras of the bank while the holdup was in progress; these pictures show Greenberg as an interested observer of what was going on while the two individuals whose argument he had just witnessed in the parking area went about their business of robbing the bank. From this record we cannot fault the trial justice's denial of the motion to pass the case.

In this jurisdiction a trial justice, as he considers a new trial motion, must make an independent appraisal of the testimony in the light of his charge to the jury, during which he may pick and choose whom and what he will believe as he weighs the evidence and assesses the credibility of the witnesses. In a criminal case, once a trial justice has evaluated the testimony, he or she then determines whether the evidence adduced at the trial is such that the controversy as presented to the jury is one upon which reasonable minds could differ as to the conclusion the factfinders should reach or whether the evidence fails to prove guilt beyond a reasonable doubt. If the trial justice, because of his or her more experienced judgment, finds that the dispute comes within the reasonable-minds-could-differ category, the new trial motion will be denied. On the other hand, if the trial justice believes the controversy to be one where the state has failed to sustain its burden of proof, a new trial will be ordered.

The trial justice, in denying Edwards' motion for a new trial, specifically rejected his alibi defense,[1] and, in assessing Greenberg's testimony, observed:

> "[T]his Court may have, had it been listening to this testimony as the sole trier of fact, required something more to convict this defendant than was adduced before this jury, but this Court cannot say that reasonable men could not differ on this testimony. * * * I can't say that the twelve people who believed Mr. Greenberg, are completely wrong."

Edwards argues that, in the light of these remarks, the trial justice should have granted him a new trial. We cannot agree.

---

[1] The state rebutted the alibi defense by presenting as a witness a rental agent for an apartment complex that is located in the Garden City section of Cranston. She testified that during the fall of 1975 Edwards was in Rhode Island living in one of the apartments. The trial justice believed her.

The comments expressed by the trial justice are almost identical to those uttered by another trial justice who denied the defendant's motion for a new trial. *State* v. *Colvin*, 82 R.I. 212, 107 A.2d 324 (1954). In upholding the denial, this court said:

> "[E]ven if his own judgment might incline him to another conclusion on one phase of the evidence, he was not entitled to merely substitute his view of contradictory evidence for that expressed by the jury's verdict, especially where different minds could naturally and fairly come to different conclusions on such evidence." *Id.* at 222, 107 A.2d at 329.

Here, the trial justice, after making his own appraisal of the evidence, expressed the belief that since the evidence was such that reasonable minds might come to different conclusions, the jury's verdict would be upheld. However, the trial justice did say that the time lapse between Greenberg's seeing the couple outside and inside the bank "was momentary and it doesn't take mental gymnastics for anybody to be able to say those are the two people who were just outside." He then went on to say that Greenberg's testimony, having in mind "the manner of his presentation, his apparent intelligence, his method of or capability in describing what he observed," furnished a sufficient evidentiary basis for the jury's guilty verdict. Try as he might, Edwards has failed to convince us that the trial justice did not do what was required of him as he considered the new trial motion. *State* v. *DaRocha*, 121 R.I. 182, 185, 397 A.2d 500, 502 (1979).

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.

Mr. Chief Justice Bevilacqua, dissenting. The majority today, consistent with its recent opinion in *State* v. *Delahunt*, 121 R.I. 565, 401 A.2d 1261 (1979), that the right to counsel attaches only to postindictment corporeal lineups, holds that the attendance of counsel is not required at

postindictment photographic viewing and identification procedures. Any federal constitutional claim to the assistance of counsel at photographc displays has been specifically rejected by the United States Supreme Court in *United States v. Ash,* 413 U.S. 300, 93 S. Ct. 2568, 37 L.Ed.2d 619 (1973). This court, however, remains free to adopt a higher standard of protection under appropriate provisions of our state constitution. *See State* v. *Maloof,* 114 R.I. 380, 389, 333 A.2d 676, 681 (1975). Because of the serious deprivation of liberty that may result from a mistaken identification, I would require the presence of counsel at postindictment photographic displays under article I, section 10, of the Rhode Island Constitution.

I make this conclusion because of my belief that, as a practical matter no difference exists between the inherent dangers of mistaken identification in an uncounseled postindictment corporeal lineup and a photographic display conducted at the postindictment stage. The general process of eyewitness identification is particularly vulnerable to a number of facts that may ultimately affect the accused's right to a fair trial. *See United States* v. *Ash,* 413 U.S. at 329, 93 S. Ct. at 2583, 37 L.Ed.2d at 638 (Brennan, J., dissenting) citing *United States* v. *Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967). *See also Criminal Procedure—Photo-Identifications—Stovall Prospectivity Rule Invoked to Avoid Extension of Right to Counsel,* 43 N.Y.U.L. Rev. 1019, 1020 (1968). Coupled with the high risk of mistaken identification is the fact that "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identifications." *Simmons* v. *United States,* 390 U.S. 377, 383-84, 88 S. Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). *See also United States* v. *Wade,* 388 U.S. at 235-36, 87 S. Ct. at 1937, 18 L.Ed.2d at 1162 (accused's fate can be largely determined at lineup).

Mistaken identification can result from unreliable eyewitness perception or memory, particularly where the witness has had slight opportunity for detailed observation during the crime. *See United States* v. *Ash,* 413 U.S. at 329, 93 S. Ct. at 2583, 37 L.Ed.2d at 638. Moreover, as the *Wade* court noted in the context of corporeal lineups "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent *in the manner in which* the prosecution presents the suspect to witnesses for pretrial identification." 388 U.S. at 228, 87 S. Ct. at 1933, 18 L.Ed. 2d at 1158 (emphasis added). The potential for such influence, albeit unintentional, exists as well at a photographic display.

A witness under strong psychological pressure to make an identification may, due to various suggestive procedures, unconsciously allow the mug shot image to gain independent status in his mind and replace the true image of the criminal which was obtained during commission of the crime. *See* Comment, *Photographic Identification: The Hidden Persuader,* 56 Iowa L.Rev. 408, 412 (1970-71). Suggestion may also be initially communicated by the fact that the witness generally assumes he is being shown pictures of criminals. Wall, *Eye-Witness Identification in Criminal Cases* 82-83 (1963). The police may also prejudice the witness by impugning the subject's character or by disclosing that the subject has been convicted of a crime similar to that viewed. *See* Comment, *Photographic Identification: The Hidden Persuader,* 56 Iowa L.Rev. at 409-11. Finally, when several witnesses make an identification in each other's presence, there is a danger of undue influence. *See* 43 N.Y.U.L. Rev. at 1022. The victim of the crime may be especially vulnerable to these suggestive influences. *See* Lasker, *Possible Procedural Safeguards Against Mistaken Identification By Eye Witnesses,* 2 U.C.L.A. L. Rev. 552, 554 (1955).

At trial, an accused attacking the fairness of a particular photographic display faces a serious hurdle in accurately reconstructing the manner and mode of that identification procedure. Because the defendant is usually absent from the

display, any assertions of possible abuse must rest on mere allegations that can be summarily rejected by the police. This absence also hampers effective cross-examination of the witness making the identification. *See* 43 N.Y.U.L. Rev. at 1021.

The attendance of counsel at postindictment photographic displays does not compel defense counsel's constant presence as the state assembles its case. A sharp distinction exists between photographic displays and other forms of pre-trial investigation. For example, any improper prosecutorial conduct during witness interviews can be flushed out by adequate cross-examination. Also, evidence obtained through a mechanical, scientific procedure can be tested and impeached on cross-examination despite defense counsel's absence from the identification proceeding. *See Gilbert* v. *California,* 388 U.S. 263, 267, 87 S. Ct. 1951, 1953-54, 18 L.Ed. 2d 1178, 1183 (1967) (handwriting exemplars).

In some instances, retention and display of photographs used may suffice to bring out the physical suggestiveness of a particular display. I believe, however, that the presence of counsel is required at postindictment photographic displays to detect the "myriad [of] almost imperceptible means of communication" such as an inflection and expression whereby law enforcement officials may influence the witnesses' identification.[2] *See United States* v. *Ash,* 413 U.S. at 334, 93 S. Ct. at 2586, 37 L.Ed.2d at 640 (Brennan, J., dissenting).

*Dennis J. Roberts II,* Attorney General, *Barry N. Capalbo,* Special Assistant Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Stephen C. Bridge,* Assistant Public Defender, for defendant.

---

[2] An examination of the record reveals that the photographic display at issue was conducted while the defendant was in custody. Because a corporeal identification is considered more reliable than a photographic identification, *see Simmons* v. *United States,* 390 U.S. 377, 386 n.6, 88 S. Ct. 967, 972 n.6, 19 L.Ed. 2d 1247, 1254 n.6 (1968), I would prohibit the use of postindictment photo identifications when a suspect is in custody.