**STATE**

v.

**Frank L. MARRAPESE.**

No. 89–39–C.A.

Supreme Court of Rhode Island.

Dec. 10, 1990.

**538**

James E. O'Neil, Atty. Gen., Jane M. McSoley, Sp. Asst. Atty. Gen., for plaintiff.

John A. MacFadyen, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of murder in the first degree arising out of the killing of Richard Callei in 1975. On April 4, 1988, the defendant was sentenced to the mandatory penalty of life imprisonment. We affirm. The facts of the case insofar as they are pertinent to this appeal are as follows.

On March 15, 1975, the body of Richard Callei was discovered by an officer of the Rehoboth, Massachusetts, police department buried approximately five feet below the surface in a wooded area of that town near a section known as the gravel pit. When the body was exhumed, it was identified as a white male with a T-shirt pulled over the head. The body was also clothed in white shoes and socks, green pants, a green shirt, and a white tie. Underneath the body a green-and-white-striped sports coat was found. The body had five gunshot wounds in the back, three stab wounds in the chest, and multiple severe skull fractures. For nine years the police were unable to focus investigation upon any particular suspect.

In the late summer of 1983 Richard D'Orio, then serving a twenty-year sentence at Walpole State Prison for attempted murder and mayhem, made statements to the Rhode Island State Police concerning the Callei homicide. These statements, although later recanted, were instrumental in causing Frank Martellucci (who had been named by D'Orio as a participant in the homicide) to approach the Rhode Island State Police in October of 1983. Martellucci's statement of his participation in the Callei murder as disclosed at trial was substantially as follows.

Martellucci, his partner John Chakouian, as well as Richard D'Orio and William Ferle were members of a "crew" (engaged in certain unspecified illegal activities) headed by Frank "Bobo" Marrapese (defendant). The crew members frequented the Acorn Social Club, which was located in the Federal Hill section of Providence and managed by defendant. Richard Callei was the chief of another similar, but more dominant, crew that also operated in the city of Providence. Among the members of the Callei crew was one Alfred Lepore who apparently had a disagreement with Chakouian. This disagreement resulted in a threat by Lepore against Chakouian and his family. Martellucci and Chakouian decided upon a pre-emptive strike against Lepore. As a result they accosted Lepore, killed him, and placed him in the trunk of a car. They buried the body in a preselected Massachusetts grave site.

After the killing of Lepore, Martellucci and Chakouian were fearful of retaliation from Callei. They told defendant, who was surprised and shocked at the Lepore killing, but suggested that he would take care of the matter.

Thereafter defendant instructed Martellucci and Chakouian to prepare a grave in Massachusetts, though he did not say for whom. They did so in an area near the Pine Valley Golf Course where Martellucci played golf from time to time. (This area corresponded to the place where the Callei body was later discovered.) After preparing the grave, Martellucci and Chakouian parted company but later met at a nightclub where they worked as bouncers. They were joined there by Martellucci's girlfriend (later, his wife), Sandra Picione, and her friend Carol Saccoccio. After the

closing of this nightclub, Martellucci and Chakouian arrived at the Acorn Club between 1:15 and 1:30 a.m., March 15, 1975. Callei came into the club dressed in a green jacket and green trousers. The defendant was tending bar and approached the table where Martellucci and Chakouian were seated. He asked whether either of them had a gun. Chakouian replied that he had a .25–caliber pistol. The defendant suggested that Martellucci and Chakouian ask the two women to leave and then went back behind the bar. Martellucci and Chakouian led the two women out of the bar to their automobile and then returned to the bar. The defendant was given a gun by Chakouian. After going briefly into the men's room, defendant emerged and began joking with Callei from behind the bar. He then moved to a position behind Callei, placed his hand on Callei's shoulder, and fired several rounds into Callei's back. Callei fell to the floor, and defendant, joined by Ferle, kicked the victim until defendant told Ferle to stop because of the quantity of blood in the bar. The body was carried outside and put into the trunk of Callei's own automobile. Before allowing the lid of the trunk to be closed, defendant went back into the bar, obtained a butcher knife, and stabbed Callei a number of times. The defendant ordered Chakouian to drive Callei's car with the body to the grave site. Martellucci followed in defendant's car. A heavy snowfall had begun, but the two men proceeded to the grave in Rehoboth where they buried Callei and then departed. Both cars were skidding as a result of the snowfall. They drove to Fall River, abandoned Callei's car, and returned to the Acorn Club in defendant's car. On the way to the club Martellucci discovered that he had left one of the shovels at the gravesite. Nevertheless, they returned to the Acorn Club and told defendant that it would be necessary for them to go back in order to retrieve the shovel. They attempted to do so, but when they neared the area where the grave had been located and Martellucci saw police cars in the vicinity, they concluded that the body had been discovered. The next day Martellucci and defendant visited Picione and Saccoccio. The defendant told them to forget that they had seen Callei but assured them that neither he nor Martellucci had anything to do with the killing.

The foregoing account of the killing of Callei as given by Martellucci was substantially corroborated by the testimony of Ferle. His recollection differed from that of Martellucci in that he did not remember defendant's going behind the bar after leaving the men's room. He recalled that defendant came directly from the men's room and shot Callei five times in the back. Ferle also denied kicking Callei after he fell to the floor.

Picione (who subsequently married and then divorced Martellucci) testified that she remembered seeing Callei enter the Acorn Club in a green suit and that she was asked to leave by Martellucci after Callei's appearance. She did not recall defendant as being present during that conversation. Saccoccio recalled that she saw Callei enter the club wearing a distinctive green suit. The defendant presented a number of witnesses who were regular patrons of the Acorn Club. They all denied that Callei had been killed in their presence. The defendant presented Inge Giglio, who had been the girlfriend of Lepore. She gave no testimony concerning the killing of Callei but claimed that she saw Callei at Feda's Restaurant on Valley Street on March 15 between 2:45 and 3:30 a.m. but could not recall how he was dressed.

It is undisputed that in consideration of testifying on behalf of the state in this case, Martellucci was permitted to plead guilty to a large number of serious felony cases, including three robberies, two murders, assault with a dangerous weapon, arson, and weapons offenses. For all these crimes Martellucci received aggregate sentences of ten years to serve with a further ten years suspended and ten years probation. The sentences were all to be served in the custody of the Rhode Island State Police. Rhode Island prosecutorial authorities were also instrumental in reducing a sentence of eighteen to twenty years that Martellucci had been serving in the Commonwealth of Massachusetts. In addition

Martellucci was given $1,200 per month for expenses after his release from custody, which release occurred in 1986. As a further part of the agreement he was to be given a new identity under the State Witness Protection Program.

William Ferle was also allowed to plead guilty to five charges of robbery, one unrelated charge of murder, arson, assault with a dangerous weapon, and obtaining money under false pretenses. For all these offenses he received an aggregate sentence of ten years to serve, ten years suspended, and ten years probation upon release. His sentence was to be served in the custody of the State Police. Ferle also was soon released from custody and given living and traveling expenses in the total sum of $25,000.

In support of his appeal defendant raises four issues. These issues will be considered in the order in which they have been raised in defendant's brief.

## I

### DID THE TRIAL COURT COMMIT ERROR IN DENYING DEFENDANT'S MOTION FOR MISTRIAL AND HIS REQUEST FOR A CAUTIONARY INSTRUCTION?

At the close of the evidence in this case, both counsel argued to the jury. Counsel for defendant argued eloquently and zealously that the two principal state's witnesses, Frank Martellucci and William Ferle, were unworthy of belief. His argument in this respect emphasized the favorable plea arrangements both had received from the state, including minimal incarceration for serious crimes and support money for personal expenses. This favorable deal, counsel suggested, furnished a very compelling motivation to lie in order to secure their advantage at defendant's expense.

In further support of his attack upon the credibility of these witnesses, counsel pointed up various inconsistencies in the testimony given at trial. In emphasizing these inconsistencies and pointing up inaccuracies, counsel was very properly attempting to raise in the jurors' minds a reasonable doubt in respect to the guilt of defendant. It is unnecessary here to outline all the inaccuracies and inconsistencies mentioned by defense counsel, but one was the unlikelihood of the commission of a murder at the Acorn Club, which looked out upon Atwells Avenue through a large picture window. He also emphasized the lack of explanation by the witnesses of the serious injuries received by Callei that he claimed could only have been produced, according to the medical examiner, by having been struck with a blunt object other than a fist or a foot.

In response counsel for the state emphasized that the inconsistencies pointed to by defense counsel were unimportant and immaterial details. He suggested that some of the inconsistencies were nothing more than a smoke screen. He also suggested that the state's witnesses were no match in repartee on cross-examination for a skilled professional advocate such as counsel for defendant. He also mentioned that the principal state witnesses were credible because the one agreement they had with the state to be performed on their part was that they would testify truthfully. He argued that if they failed to testify truthfully, their entire plea agreements would become null and void.

On three occasions during the course of the final argument of the prosecutor, defense counsel objected. The first portion to which objection was made centered on the inconsistencies raised by Richard Egbert:

"And at times Mr. Egbert very effectively and flamboyantly pointed out those inconsistencies, no question about it, but again what you have here is people of limited intelligence, even people who are very bright, who tell about an occurrence more than once, particularly after eight years originally and then twelve years now. Every time they tell that story to varying degrees they're going to tell it differently, and that's human nature, and that's what rings the bell of truth. There has been a suggestion that this is a case where the Rhode Island State

Police, Department of the Attorney General, Frank Martellucci and Billy Ferle got together and conspired to fabricate and frame Mr. Marrapese, but those inconsistencies show you that's not the case. This is the way these people are recalling that event. This is not a script, this is not a t.v. show. This is not an Agatha Christie's 'Murder She Wrote', this is murder that he committed, Frank Marrapese.

"Now, I'm not being critical of Mr. Egbert. He did the job that he was supposed to do, he was hired to do. If the roles were reversed and Billy Ferle was sitting over there, he'd be telling you that witness X * * *.

"Mr. Egbert: I object."

In response to this objection, the trial justice stated, "I think, Mr. Burns, we might avoid speculating as to other scenarios that are not before this jury."

The next portion of the argument to which objection was raised involved the witness-protection program.

"You heard a lot about the deal, the Federal Witness Protection Program. Well, like it or not, this program exists because somewhere along the line decades ago, after years of frustration, somebody in law enforcement said to themselves * * *."

"Mr. Egbert: I object. This matter is not in evidence."

In response to this objection, the trial justice made the following comment: "I think we ought to take this opportunity to remind the jurors that it is your memory of what the testimony is that prevails. I said before that if counsel suggest certain facts and you don't remember them, it's your memory that prevails. You may move along Mr. Burns."

It should be mentioned at this point that it is undisputed that the witness protection program in which the state's witnesses were involved was not a federal program but a state program.

The next point of the argument to which objection was raised was as follows:

"Now, these suggest one of three things, three things only. Number one, that it's an incredible coincidence, an impossible coincidence that they just said to themselves, 'Let me think in my mind what kind of a lie I can make up,' and that's what they both made up. That's impossible.

"Number two, there's a conspiracy between the Rhode Island State Police, the Department of the Attorney General, Frank Martellucci and Billy Ferle to frame poor Mr. Marrapese, the kindly tavern owner.

"Mr. Egbert: I object."

In response to this objection the court took the following action:

"Mr. Burns, do you move to strike what you just said?"

"Mr. Burns: No, Your Honor.

"The Court: I strike it, the way in which this defendant was characterized. There is no evidence to support that statement. I ask that you disregard it, please."

After final argument had been completed, counsel for defendant moved for a mistrial on the ground that some of the comments that had been made by the prosecuting attorney tended to inflame the jurors against defendant and his counsel. The court pointed out that the specific elements of the argument upon which counsel based the request for a mistrial were not objected to. The trial justice took the motion under advisement but allowed counsel to argue more fully after she had completed her charge to the jury. At that point the trial justice reviewed the prosecutor's argument in light of standards set by this court in *State v. Mello*, 472 A.2d 302 (R.I.1984), and Standards of the American Bar Association for Criminal Justice relating to prosecutorial argument and conduct. At the conclusion of a lengthy and complete analysis, she made the following comment:

"You can't separate Mr. Burns' argument from the context of the Ferle/Martellucci testimony. While it may have sounded prejudicial and reaching for facts not in evidence, I think if you put the Ferle/Martellucci testimony togeth-

er, there are permissible inferences that Mr. Burns could have drawn—asked the jury to draw, and could have argued to the jury that they should draw.

"The motion to pass the case is denied."

■ We have stated in *State v. Brown*, 522 A.2d 208, 210 (R.I.1987), that the decision concerning the declaration of a mistrial is within the sound discretion of the trial justice. *State v. Collazo*, 446 A.2d 1006 (R.I.1982); *State v. Anil*, 417 A.2d 1367 (R.I.1980). In the event that the trial justice denies such a motion, his or her determination will be given great weight and will not be disturbed on appeal unless it is clearly wrong. *Collazo*, 446 A.2d at 1010; *State v. Pailin*, 114 R.I. 725, 339 A.2d 253 (1975). We went on to say in *State v. Brown* that "the trial justice must evaluate the probable effect of the prosecutorial conduct on the outcome of the case by examining the remark or question in its factual context." 522 A.2d at 211 (citing *State v. Pugliese*, 117 R.I. 21, 362 A.2d 124 (1976)). The test essentially is whether the prosecutor's comment or question so inflames the passions of the jurors as to prevent their calm and dispassionate examination of the evidence. 522 A.2d at 211.

We have examined the transcript of the prosecutor's argument with particular reference to defendant's motion for a mistrial and the trial justice's response thereto. We believe that each time counsel for defendant objected, the trial justice made a reasonable response thereto with an appropriate admonition to the jury. Examining the argument as a whole, we are in agreement with the trial justice that this argument would not be inclined to inflame the passions of the jury sufficiently to prevent their calm and dispassionate examination of the evidence. We conclude that the trial justice was not clearly wrong in denying the motion for a mistrial and that the instructions she gave to the jury and the response she made to the objections raised by defense counsel were adequate. No further cautionary instructions than those that she gave were required.

II

DID THE TRIAL JUSTICE IMPERMISSIBLY LIMIT CROSS–EXAMINATION OF FRANK MARTELLUCCI IN LIGHT OF HIS ASSERTION OF ATTORNEY–CLIENT PRIVILEGE?

■ In the course of cross-examining Martellucci, counsel for defendant attempted to elicit from the witness communications that he had made to his attorney concerning his role in the Callei murder. Counsel suggested that the prior attorney, Barry Wilson, had admitted that Martellucci had discussed with him his participation in the crime. Defense counsel had no knowledge of the subject matter of this discussion but suggested that it might produce a "story inconsistent with the one he's telling now." The trial justice granted a voir dire hearing in order to determine whether Martellucci would assert the attorney-client privilege. Martellucci testified that he had been represented by Wilson at the time he testified before the grand jury. In regard to all other questions concerning the subject matter of communications to that attorney, Martellucci asserted and declined to waive his attorney-client privilege.

Rhode Island has long recognized the attorney-client privilege and has shielded from disclosure the confidential communications between a client and his or her attorney. *See, e.g., State v. Juarez*, 570 A.2d 1118 (R.I.1990); *State v. von Bulow*, 475 A.2d 995 (R.I.1984); *DeFusco v. Giorgio*, 440 A.2d 727 (R.I.1982); *Wartell v. Novograd*, 48 R.I. 296, 137 A. 776, 53 A.L.R. 365 (1927).

The attorney-client privilege has been described by Professor Wigmore as the oldest of the privileges for confidential communications, tracing its history to the reign of Elizabeth I when the privilege already appeared as unquestioned. 8 Wigmore, *Evidence* § 2290 (McNaughton Rev.1961). We have recently stated in *State v. Juarez*, 570 A.2d 1118, 1121 (R.I.1990), that this privilege would be sustained, as long as it is not waived, in the face of a challenge based upon the confrontation clause. This assertion is in accord with the general rule enun-

ciated in 8 Wigmore, *Evidence* § 2327 at 637–38, which sets forth the following specific elements.

"(1) The client's offer of his *own testimony* in the cause *at large* is not a waiver for the purpose either of cross-examining him to the communications or of calling the attorney to prove them. Otherwise the privilege of consultation would be exercised only at the penalty of closing the client's own mouth on the stand.

\* \* \* \* \* \*

"(3) The client's offer of his *own testimony* as to *specific facts* about which he has happened to communicate with the attorney is not a waiver, 'for the same reason as in paragraph (1) *supra*."

In the case at bar there is no question that the client did not disclose in his testimony or otherwise any communication between him and his former counsel. His testimony consisted of his own recollection of the events surrounding the Callei murder in which he himself participated.

The defendant cites in support of his argument our opinion in *State v. von Bulow*, 475 A.2d 995 (R.I.1984). His reliance upon this case is misplaced, for we expressly decided in *von Bulow* that the attorney-client privilege had been waived by the disclosure of information to the State Police by Attorney Richard Kuh with the consent of his clients. We suggested that the facts of that case constituted a classic example of the impermissible selective use of privileged information. We recognized that even though the parties maintained that communications were intended to be confidential, the attorney at the client's direction disclosed information sufficient to trigger an investigation by the State Police and an indictment. *Id.* at 1006–07. No such circumstances may be found in the case at bar.

Defense counsel cites a balancing test set forth by the Supreme Court of Connecticut in *State v. Cascone*, 195 Conn. 183, 487 A.2d 186 (1985). It is true that under the specific facts found in *Cascone*, the Supreme Court of Connecticut held that a communication made by a codefendant to an attorney in the presence of the defendant, wherein the codefendant asserted that the defendant had not been involved in the crime, should be disclosed under the balancing test. It is interesting to note that the Connecticut Supreme Court cited for this proposition 8 Wigmore, *Evidence*, § 2285(4) at 527, which relates to the *establishment* of a privilege as opposed to the honoring of the privilege once established. Obviously the privilege has been recognized at common law for centuries. Thus we believe that the balancing test at this point is inappropriate. In any event we distinguished the circumstances of *Cascone*, in our own recent decision in *Juarez*, in which we noted that the Supreme Court of Connecticut in *State v. Silva*, 201 Conn. 244, 256, 513 A.2d 1202, 1208 (1986), would not apply the balancing test of *Cascone* on the basis that the defendant in *Cascone* actually knew that the codefendant had exonerated him to the attorney who originally represented both of them. In *Silva* the defendant could only surmise that some inconsistencies or other beneficial disclosure might come to light. In these circumstances the Supreme Court of Connecticut held that mere curiosity should not be enough to overcome the attorney-client privilege. *Id.*

In *Juarez*, 570 A.2d at 1121, we also cited a number of cases in which the attorney-client privilege was not breached in respect to statements made by codefendants under the confidentiality shield of the attorney-client privilege. *See Commonwealth v. Scott*, 503 Pa. 624, 470 A.2d 91 (1983); *Commonwealth v. Hutchinson*, 290 Pa.Super. 254, 434 A.2d 740 (1981); *State v. Hitopoulus*, 279 S.C. 549, 309 S.E.2d 747 (1983).

Our conclusion in *Juarez* was that the attorney-client privilege should not be breached routinely. The circumstances of this case would not compel a balancing test even under the Connecticut rule. Here we have no more than mere curiosity on the part of defense counsel, who wished to engage in a fishing expedition in the hope that some inconsistencies might be found between the communication to counsel and

the testimony given by Martellucci in court. We stated that such curiosity was insufficient to breach the privilege.

Consequently the trial justice did not commit error in declining to allow cross-examination in respect to such protected communications.

## III

### DID THE TRIAL JUSTICE ERR IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL?

In support of this issue defendant argues in effect that the eyewitness testimony of Martellucci and Ferle was so inherently incredible as not to constitute a prima facie case that qualified for submission to the jury. The difficulty with this argument is that it overlooks the standard that both the trial court and this court must apply in passing upon a motion for judgment of acquittal. We have frequently reiterated the rule that on a motion for a judgment of acquittal the trial justice must view the evidence in the light most favorable to the state without passing upon the credibility of witnesses or weighing the evidence. After viewing the evidence in the light most favorable to the state, the trial justice is further required to draw all reasonable inferences therefrom consistent with the guilt of the accused. *See, e.g.,* *State v. Fenner,* 503 A.2d 518 (R.I.1986); *State v. Benevides,* 425 A.2d 77 (R.I.1981); *State v. Smith,* 121 R.I. 495, 401 A.2d 41 (1979). In the case at bar, it is obvious beyond question that the eyewitness testimony of Martellucci and Ferle in relation to the murder of Callei would, if believed, establish beyond a reasonable doubt that defendant committed the crime with which he was charged. The trial justice, consequently, was correct in denying this motion.

## IV

### DID THE TRIAL JUSTICE ERR IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL?

The defendant argues that the trial justice may not have applied the appropriate rule in denying his motion for new trial. He calls into question the validity of the rule enunciated in *State v. Barnes,* 122 R.I. 451, 409 A.2d 988 (1979), in light of the decision by the Supreme Court in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and elucidated further in respect to motions for new trial by *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). He also suggests that the trial justice should have followed a more specific rule enunciated in *State v. Dame,* 560 A.2d 330 (R.I.1989). In *Dame* we again recited the standard that a trial justice must apply when passing upon a motion for new trial. This standard was succinctly set forth as follows:

"This court clearly delineated the function of a trial justice when considering such a motion in *Fox v. Allstate Insurance Co.,* 425 A.2d 903 (R.I.1981). First, the trial justice must consider all material evidence in light of the charge to the jury. *Id.* at 907. Using independent judgment, the trial justice must pass upon the weight and credibility of the evidence and accept or reject conflicting testimony. *Id.* At that point all proper and appropriate inferences may be drawn from the evidence adduced at trial. *State v. Edwards,* 122 R.I. 228, 236, 405 A.2d 1161, 1165 (1979). The trial justice must then determine whether the evidence presented a controversy upon which reasonable minds could differ or whether the evidence failed to prove guilt beyond a reasonable doubt. *Id.* A new trial may be subsequently granted if the trial justice has reached a different conclusion from that of the jury and if it is specifically found that the verdict is against the fair preponderance of the evidence and fails to do substantial justice. *State v. Henshaw,* 557 A.2d at 1208; *Yammerino v. Cranston Tennis Club, Inc.,* 416 A.2d 698, 699–700 (R.I. 1980). The new-trial motion must be denied, however, if the trial justice finds that the evidence is balanced or reasonable minds could differ. *Beauchemin v. Sweeten,* 471 A.2d 624, 626 (R.I.1984)

(citing *Yammerino*, 416 A.2d at 699–700)." 560 A.2d at 333.

In the event that a trial justice applies this standard and exercises his or her independent judgment in determining whether the evidence supports the verdict, his or her decision will be entitled to great weight and will be disturbed only when the trial justice overlooked or misconceived relevant or material evidence or was otherwise clearly wrong. *Id.* at 332–33; *State v. Henshaw*, 557 A.2d 1204, 1207–08 (R.I. 1989).

In *State v. Girouard*, 561 A.2d 882, 890–91 (R.I.1989), we again emphasized that in considering a motion for a new trial, the trial justice assumes the role of a superjuror because of his or her more experienced judgment. We set forth a four-step analysis that the trial justice should undertake, but we cautioned that if the trial justice concurs with the jury, then at this point the motion for a new trial should be denied.

It should be noted that the trial justice must apply the deferential standard in respect to the jury's finding only in the event that the trial justice disagrees with the verdict after exercising his or her independent judgment on the credibility of witnesses and weight of the evidence. In the case at bar, although we concede that the colloquy between the trial justice and counsel might have indicated some disagreement concerning the standard to be applied in the event that the trial justice disagreed with the verdict, the most significant factor in our determining whether the trial justice erred is that she, in fact, did not disagree with the jury's verdict. A short examination of her decision on the motion makes it clear beyond doubt that the trial justice believed, after analyzing the evidence, that the credible evidence supported the verdict. She found that the evidence given by Martellucci and Ferle was corroborated in many important particulars by the medical examiner's testimony and by the physical evidence. She culminated her analysis by stating:

"They [the jurors] chose to believe Martellucci and Ferle, and I cannot say that this jury was wrong. Though reasonable minds may have differed with respect to the guilt of this defendant, it's the function of the court to determine whether the believable evidence supports the verdict. It does. The motion is denied."

This statement by the trial justice indicates clearly that she exercised her independent judgment and determined that the credible evidence supported the verdict. It was therefore unnecessary for her to take the next step in the analysis, which would have been required in the event that she disagreed with the verdict. It seems reasonably clear that she performed her function in accordance with the standard set forth in *State v. Dame* and *State v. Girouard*, both *supra*, and reached the same conclusion as did the jury. In reaching this conclusion, our independent review of the evidence causes us to conclude that the trial justice did not overlook or misconceive relevant and material evidence and that she was not otherwise clearly wrong. In spite of the calumny heaped upon witnesses Martellucci and Ferle because of their favorable plea agreements and other advantages accorded them by the state, both the jury and the trial justice found that they were worthy of belief. Under our standard of review, we see no basis for disagreement with this finding.

## V

DID THE TRIAL JUSTICE ERR IN REFUSING TO INSTRUCT THE JURY ON ACCOMPLICE TESTIMONY AND ON DEFENDANT'S THEORY OF DEFENSE?

As defendant concedes in his argument on this issue, we have consistently taken the position that it is not necessary for the trial justice to give an accomplice instruction to the jury. *State v. Mastrofine*, 551 A.2d 1174 (R.I.1988); *State v. DeMasi*, 413 A.2d 99 (R.I.1980). We stated explicitly in *State v. Fenner*, 503 A.2d at 525, that it "is not the function of a trial justice to act as advocate for either the prosecution or the defense. Counsel are given adequate opportunities to argue matters of credibility, including bias, motiva-

tion, anticipated benefits, or rewards." In *DeMasi* we specifically expressed the opinion that it was not necessary for a trial justice to make, in effect, an impeaching comment upon the testimony of an erstwhile accomplice who had been granted immunity by the Attorney General. *DeMasi*, 413 A.2d at 100.

We are not persuaded that we should reconsider these cases in the light of the circumstances of this case.

■ In respect to the suggestion that the trial justice has an obligation to outline the defendant's theory of defense, he cites *State v. Milazzo*, 116 R.I. 443, 447, 358 A.2d 35, 37 (1976). The defendant's reliance on this case is misdirected. *Milazzo* holds that the trial justice was obligated to instruct the jury on the elements of the alleged offense. There is no question that the trial justice gave a comprehensive instruction on the elements of the alleged offense in the case at bar. We believe, however, that the outlining of defendant's theory of defense is best left, in accordance with our opinion in *State v. Fenner, supra,* to counsel for the defense. The attorney for the defendant is in the best position to set forth what he perceives to be the theory of defense in his or her final argument. Although we do not suggest that it would be error for a trial justice to define the issues presented by the parties in a criminal case, he or she has no obligation to set forth a defendant's theory of defense. The possibility of misstating such a theory may well deter the trial justice from venturing into what may be uncharted territory.

Consequently the trial justice did not err in failing to give either an accomplice instruction or an outline of the defendant's theory of defense.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction entered in the Superior Court is hereby affirmed. The papers in the case may be remanded to the Superior Court.